[Civil No. 2207.   Filed August 28, 1923.]

[218 Pac. 139.]

BLACK AND WHITE TAXICAB COMPANY, a Corporation, Appellant, v. STANDARD OIL COMPANY, a Corporation; JAMES H. KERBY, as Secretary of State of the State of Arizona, and STATE OF ARIZONA, at the Relation of JOHN W. MURPHY, Attorney General of the State of Arizona, Appellees.

1. CONSTITUTIONAL LAW—CONSTRUED IN FAVOR OF CONSTITUTIONALITY. A statute will, if fairly susceptible thereof, be given a construction which will sustain its constitutionality, and will not be declared unconstitutional, unless the court is satisfied thereof beyond a reasonable doubt.

2. STATUTES—HIGHWAY LAW HELD TO HAVE BUT SINGLE SUBJECT AND THAT EXPRESSED IN TITLE.—Laws of 1923, chapter 76, *held* to embrace but one subject, and that expressed in the title, as required by Constitution, article 4, part 2, section 13, namely, highways, their construction, maintenance, the raising of revenues

2. Necessity and sufficiency of reference in title of statute to appropriations to put its purpose into effect, see note in **L. R. A.** 1917B, 812.

Question of particularity of specification of purpose required in appropriation bill, see note in 20 **A. L. R.** 981.

See 12 C. J., pp. 787, 791; 25 Cyc. 603; 36 Cyc. 962, 1025, 1037.

therefor, and the manner of their expenditure or distribution; the provisions being all directly or indirectly connected with the subject and not incongruous therewith, and the fact that there are several separate projects or road improvements designated not constituting each a separate subject, they being in connection with a general system of road construction.

3. STATUTES — HIGHWAY LAW NOT A SPECIAL APPROPRIATION BILL EMBRACING MORE THAN ONE SUBJECT.—Laws of 1923, chapter 76, as to highways, *held* not to violate Constitution, article 4, part 2, section 20, requiring a special appropriation bill to embrace but one subject.

4. LICENSES — LAW IMPOSING GASOLINE TAX HELD TO DISTINCTLY STATE ITS OBJECT.—Within Constitution, article 9, section 3, requiring every law imposing a tax to "state distinctly the object of the tax," the provision of Laws of 1923, chapter 76, disposing of one-half of the three cents per gallon gasoline tax to the counties, *held* to distinctly state its object to be for the maintenance of county roads and highways.

5. STATUTES — NO POWER TO VETO ALONE PART OF BILL IMPOSING TAX.—Constitution, article 5, section 7, empowering the Governor, when a bill "contains several items of appropriations" to veto one or more of them without affecting the remainder of the bill, gives him no power to veto the part of a bill simply imposing a tax.

6. STATUTES — APPORTIONMENTS OF MONEY FROM GASOLINE TAX FOR HIGHWAYS NOT ITEMS OF APPROPRIATION WITHIN VETO POWER.— The apportionments by Laws of 1923, chapter 76, section 10, subdivision 3, paragraph d, of certain percentages of the money from the tax on gasoline for highways to certain accounts, are not items of appropriation, within the veto power as to such items given by Constitution, article 5, section 7.

7. STATUTES—PROVISION GIVING COUNTIES HALF OF GASOLINE TAX NOT "APPROPRIATION" WITHIN VETO POWER.—The provision of Laws of 1923, chapter 76, section 10, subdivision 3, paragraph d, giving to the counties half of the gasoline tax imposed by such statute for highways is not an item of appropriation within Constitution, article 5, section 7, as to separate veto power; an element of the definition of "appropriation" being that the money appropriated be out of the general revenues of the state.

8. STATUTES—DISAPPROVAL OF APPORTIONMENT OF PROPERTY TAX FOR HIGHWAYS NOT WITHIN VETO POWER.—The disapproval merely of the apportionment between state and counties, made by Laws of 1923, chapter 76, section 10, subdivision a, of the property tax thereby imposed for highways, is not within the veto power as to items of appropriation given by Constitution, article 5, section 7.

APPEAL from a judgment of the Superior Court of the County of Maricopa. Stephen H. Abbey, Judge. Affirmed.

Messrs. Baker & Whitney, for Appellant.

Messrs. Ellinwood & Ross and Mr. James S. Casey, for Appellee, Standard Oil Co.

Messrs. Barnum & Flanigan, for Appellee, Kerby.

Mr. John W. Murphy, Attorney General, Mr. A. R. Lynch and Mr. Earl Anderson, Assistant Attorneys General, and Mr. H. A. Elliott, Assistant Counsel, for Appellee, State of Arizona.

ROSS, J.—This action was brought by the Black & White Taxicab Company against the Standard Oil Company and James H. Kerby, Secretary of State, to recover seventy cents which the plaintiff claims the Standard Oil Company overcharged it for gasoline. The complaint shows that the defendant Standard Oil Company is a dealer in gasoline and its products within Arizona; that it made such overcharge in pursuance of the terms of chapter 76, Session Laws of 1923, which require every dealer in gasoline to collect from the purchaser thereof three cents per gallon and at stated intervals pay the same to the defendant Secretary of State. It is alleged the three-cent tax was paid under protest. Recovery is sought upon the ground of the unconstitutionality of chapter 76; it being claimed it violates several provisions of the state Constitution. It is also claimed the Governor vetoed the provision of such chapter requiring dealers to collect three cents tax per gallon of purchasers of gasoline. After the suit was instituted, upon the petition of the Attorney General the State was permitted to intervene at his

relation. The defendants and the intervenor filed general demurrers to the complaint which were sustained, and a judgment of dismissal entered. The effect of the judgment was to hold the law constitutional and the veto ineffective, and to impose upon the defendant oil company and all other dealers in gasoline the duty of collecting the three cents per gallon from purchasers of gasoline, and at stated periods remit such collections to the Secretary of State.

The taxicab company has appealed from the judgment. It is contended that chapter 76 offends section 13, part 2, article 4 of the Constitution, section 20, part 2, article 4, section 3, article 9, and section 9 of article 9.

As the questions raised have to do with the title of the act as well as the body thereof, we give here the title. It is as follows:

"An act to provide funds for the construction and completion of certain designated highway projects, within the state of Arizona, initiated or authorized, but not completed by the board of directors of state institutions and office of state engineer, prior to January 1, 1923; authorizing the refunding, for use on any specific or designated highway project, of funds paid by any political subdivision of the state of Arizona, to the state of Arizona for the use of the board of directors of state institutions and of said office of state engineer of the state of Arizona, for the construction of such specific and designated highway projects and diverted, prior to January 1, 1923, by said board of directors of state institutions and of said office of state engineer, to purposes other than such specified and designated projects; making an appropriation therefor; providing for the raising of funds to meet such appropriation by means of 25% apportionment of state road tax, tax upon passenger capacity per mile, upon designated common carriers; a tax upon truck tonnage of motor trucks and tax upon gasoline and other distillates of crude petroleum; regulating and providing for the deposit, use,

accounting for and disbursement of monies paid to the state of Arizona by such subdivisions of the state of Arizona for the construction of designated road projects and moneys paid to the state of Arizona by the United States of America, by virtue of co-operative agreements between the state of Arizona and the United States of America pursuant to an act of the Congress of the United States of America entitled 'An act to provide that the United States shall aid the states in the construction of rural and post roads, and for other purposes' or of any amendment thereto, or pursuant to any other act enacted by the Congress of the United States of America for like purposes; providing for the issuance of, registration and payment of negotiable state warrants and providing for the issuance of negotiable treasurer's certificates of the state of Arizona in anticipation of the collection of the taxes authorized by this act; prescribing the form of such warrants and certificates, the due date and rate of interest thereon; defining offenses in violation of this act and providing penalties therefor.''

Sections 1, 2, 3 and 4 of the act provide funds or make appropriations to take care of eight federal aid projects already constructed or in course of construction in different parts of the state, and recognize that those projects have been or are being constructed co-operatively by and between the state and the counties of the state, and by and between the state and the United States, and that, in prosecuting the work, funds have been borrowed from counties by the board of directors of state institutions and the state engineer and not repaid, and that all of the federal government's proportionate contribution has not been made. Repayments to the counties are authorized and directed, and the disposition of the federal aid is provided for, as the same is paid in.

Under section 5 the appropriation for such projects and purposes is made out of the 25 per cent apportionment account of the general fund of the state,

and under said section there is further appropriated out of said fund "for the construction and completion of those certain highway projects within the state of Arizona initiated or authorized, but not completed by the board of directors of state institutions and by the office of the state engineer of the state of Arizona prior to January 1, 1923" moneys for forty-eight other named federal aid and nonfederal aid projects located and situated in different parts of the state. The total appropriation out of the 25 per cent apportionment account for the purposes of repaying borrowed money from the counties and completing all of such federal aid and nonfederal aid projects is $1,550,000.

Section 6 authorizes the board of supervisors to enter into contracts with the board of state institutions to expend upon projects within their counties the 75 per cent fund hereinafter mentioned and to pay into the state treasury, out of said fund to be credited to a segregated account within the general fund of the state in favor of such aid projects, the sum agreed to be contributed. Said section also provides the method of handling and crediting federal aid funds.

Sections 7, 8, and 9 contain general provisions for carrying out the general objects of the act.

The Governor's veto was directed to provisions of section 10, and we give such parts thereof as we think essential, italicizing those portions thereof disapproved or vetoed by the Governor:

"Section 10. For the purpose of providing said sum of $1,550,000.00, appropriated in section 5 of this act, the following moneys, funds and license taxes are hereby designated and created:

"(a) There shall be annually levied and collected in the manner in which other state taxes are levied and collected, by a levy of the officials provided by law, a tax of ten (.10) cents on each one hundred

($100.00) dollars, of the assessed valuation of taxable property within the state, for the purpose of the construction, reconstruction, repairing, improving and maintaining state highways and bridges, *as follows:*

*"25% of such tax, herein provided, for, shall be as paid into the treasury of the state of Arizona, deposited by the treasurer of the state of Arizona, in a separate account, in the general fund of the state, to be known and designated as 25% apportionment account.*

*"Seventy-five per cent (75%) of such 'state road tax fund' herein provided for, shall be apportioned to the several counties in the amount to each county of seventy-five per cent of the taxes collected under this act, by said county, and such amount shall be subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges in the manner as in this act provided for the work in this act provided for within such county upon the authority and under the direction of the county board of supervisors of such county and the state engineer who are hereby charged with such responsibility.*

"Subdivision II.

*"(a) There hereby is authorized to be levied and collected a (one-half mill) tax per each scheduled passenger capacity mile, which hereby is defined to mean a tax of (one-half mill) on each and every unit of seating capacity operating over each and every mile between fixed termini, or otherwise, in the state of Arizona, as per schedules on file with the Corporation Commission, or otherwise.*

*"(b) There hereby is authorized to be levied and collected a (two mill tax) per each scheduled truck ton capacity, or fraction of truck ton capacity mile, which hereby is defined to mean, (a tax of two mills) on each and every actual truck ton or fraction of truck ton capacity load operating over each and every mile between fixed termini, or otherwise, in the state of Arizona, as per schedules on file with the Corporation Commission, or otherwise.*

　　*　　　*　　　*　　　*　　　*　　　*　　　*

"Subdivision III.

*"(a) That each and every dealer, as defined in this act, who is now engaged or who may hereafter*

*engage in his own name, or in the name of others, or in the name of his representative or agents of this state in the sale, use or distribution, as dealers and distributors of gasoline or other distillates of crude petroleum shall not later than the fifteenth (15) day of each calendar month render a statement to the Secretary of State of the state of Arizona of gasoline and other distillates of crude petroleum sold, used or distributed by him or them in the state of Arizona during the preceding calendar month, and collect a license tax of three (3) cents per gallon on all gasoline and other distillates of crude petroleum so sold, used or distributed for use in motor propelled or motor-driven vehicles, as shown by such statement in the manner and within the time hereinafter provided, which tax shall be added to the sale price of the dealer as herein defined when sold, used or distributed for such use in said motor-propelled or motor-driven vehicles only.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

"(d) Said license tax shall be paid on or before the fifteenth (15th) day of each month to the Secretary of State, who shall receipt to the dealer therefor, and promptly turn over to the State Treasurer as are other receipts of his office, *and the State Treasurer shall place one-quarter of the same in said 25% apportionment account in the general fund and one-quarter of the same to the account of the 75% apportionment account of the general fund, and said Secretary of State shall promptly pay the remaining one-half of such tax to the several county treasurers of the state of Arizona, in proportion to the amount of such tax received from the respective counties, which shall be used by the said several counties as may be determined by the board of supervisors thereof, for the maintenance of county roads and highways. . . .* "

The rest of the act (sections 11, 12, 13, 14, 15 and 16) contains general provisions in aid of the purpose of the act.

The appellant's assignments of error are:

1st.  That chapter 76 embraces more than one subject and matter properly connected therewith;

2nd.  That such chapter embraces a subject which is not expressed in the title, to wit, the provision that 50 per cent of the gasoline tax shall be paid to the several counties from which the same is received;

3rd.  That the use of said 50 per cent of the gasoline tax by the counties for the maintenance of county roads and highways is for a different use than that indicated by the title of the act;

4th.  That said chapter 76 fails to fix the object for which such 50 per cent of the gasoline tax is to be expended;

5th.  That said chapter 76 is a special appropriation bill and embraces appropriations for several different subjects; and

6th.  The provision of chapter 76 imposing a gasoline tax of three cents on every gallon was vetoed, and the collection of such tax by defendant oil company was without authority of law, and, appellant having paid it under protest, was entitled to a judgment therefor.

We will take these assignments up and dispose of them, not in the order given, but in the relation they bear to each other. As the first five challenge the constitutionality of chapter 76, we preface their consideration with a general statement of the principles that we shall observe in their disposition:

"The most common application of the maxim *ut res magis valeat quam pereat* in the construction of statutes is to be found in the decisions which, by the construction of the terms of statutes, sustain them against attacks upon their constitutional validity. When the constitutionality of a statute is questioned it is the duty of the courts, and also a rule of construction, to adopt such construction as will make the statute constitutional if its language will permit. There is a strong presumption in favor of the validity and constitutionality of an act, and courts should not declare acts of the legislature unconstitutional unless satisfied of their unconsti-

tutionality beyond a reasonable doubt. Where an act is fairly susceptible of two constructions, one of which will uphold the validity of the act while the other will render it unconstitutional, the one which will sustain the constitutionality of the law must be adopted." 25 R. C. L. 1000, § 243.

We have frequently stated that we would not declare an act of the legislature unconstitutional unless satisfied thereof beyond a reasonable doubt, and that seems to be the rule followed by most of the courts. Does chapter 76 offend section 13, part 2, article 4, of the Constitution, reading as follows:

"Sec. 13. Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

We think the title as well as the body of the act has to do generally with the public highways of the state; in other words, the subject expressed in the title and treated in the act as "highways"—their construction, maintenance, the raising of revenues therefor, and the manner of their expenditure or distribution. Closely allied to that general subject and in consonance therewith is the providing for the payment of any highway construction already completed or in the course of completion and the repayment of borrowed money by one of the political units to others, and the ratifying and approving of contracts for future construction and providing funds therefor. Nor does the fact that there may be several separate projects or road improvements designated in the act as "federal aid No. ——" or "nonfederal aid No. ——" constitute each of said proposed improvements separate subjects; they are all a part or segments of the same subject of highways.

Since the passage of chapter 66, First Special Session Laws of 1912, entitled ''An act relating to the construction, maintenance and improvement of state roads and bridges; creating the office of state engineer, prescribing the duties thereof and compensation therefor; fixing a tax levy and making appropriation to carry out the provisions of this act, and authorizing and directing the expenditure of such appropriation,'' the state has had, in fact, a system or systems of highways extending east and west and north and south across the state under the general charge of the board of state institutions and state engineer, and during the last four or five years there have been expended annually by the state, with the aid of its counties and the federal government, about $3,000,000 in the construction and improvement thereof under a program patterned somewhat after the system laid out in chapter 76, but without the safeguards it provides. So, while segments of the state highway may be constructed under separate contracts and appropriations set aside out of the revenues of the state to take care of said segments separately, they are all a part of the same highway system and are for the accomplishment of the same general object, and their inclusion in chapter 76 does not offend section 13, part 2, article 4, of the Constitution. If the mental horoscope be limited to the language used in chapter 76, some doubt might arise as to whether each piece of road construction therein mentioned was a separate subject and treated as such; but, if the vision be as extensive and broad as our legislation since statehood, the doubt will dissolve itself into an absolute certainty that it is all in aid of the general system of highways constructed and to be constructed in the state.

The conclusion reached by Mr. Justice COOLEY in *People* v. *Denahy,* 20 Mich. 349, relied upon by ap-

pellant, was based upon a very different state of facts. In that case the learned judge held the act contained a plurality of subjects, because each road to be improved was a separate and distinct improvement upon a separate and distinct highway. He says: "The act, it will be seen, is not one which establishes a general system . . . for the construction of state roads," leaving the clear inference that, had the improvements been in connection with a general system of road construction it would have called for a different conclusion.

But it is said there is nothing in the title of the act about any apportionment of the tax levy to the counties for the maintenance of their roads and highways, and, therefore, the allocation of 50 per cent of the gasoline tax to the counties for that purpose was and is a subject not contained in the title, and the act for that reason violates said section 13 of the Constitution. Wherever, in the title or body of the act, the words "political subdivisions" of the state are mentioned reference is had to the counties of the state. In both the title and act counties are given a prominent part and are supplied with the means of effectually carrying forward their portion of the burden in highway construction. We think the phrase in the title, "Providing for the raising of funds to meet such appropriation by means of 25 per cent apportionment of state road tax, tax upon passenger capacity per mile, upon designated common carriers; a tax upon truck tonnage of motortrucks and tax upon gasoline and other distillates of crude petroleum," was a sufficient notice and warning to the members of the legislature and the people that some disposition of such revenues over and above that given to the 25 per cent state apportionment would be made, and naturally, since such revenues all come from the counties, the counties would

be given an apportionment to be used co-operatively with the state and the United States in the construction of roads within their boundaries and for their maintenance after construction, which is made by the statute the sole duty of the counties. Paragraph 5126, Civ. Code. As was said in *State* v. *Ingalls,* 18 N. M. 211, 135 Pac. 1177, in speaking of an act to provide for state license on automobiles:

"The disposition of the funds resulting from the collection of the license was perhaps even a necessary part of the act and certainly is not incongruous to the subject expressed in the title."

Reasoning upon a question somewhat akin to the one before us, in *Wilson* v. *State,* 143 Tenn. 55, 224 S. W. 168, the court said:

"It is not essential to the constitutionality of a statute that its title epitomize or recite in detail the provisions contained in its body. *State* v. *Schlitz Brewing Co., supra; State* v. *Yardley, supra; Memphis R. Co.* v. *State,* 110 Tenn. 598, 75 S. W. 730; *State* v. *Brown,* 103 Tenn. 449, 53 S. W. 727.

"The general purpose of the provisions of section 17 of article 2 of the Constitution is accomplished when the law has but one general purpose, which is fairly indicated by its title. It will not be required that every end and means necessary or convenient for the accomplishment of this general object be provided for by a separate act relating to that alone. Such a requirement would not only be unreasonable, but would render legislation impossible. *Cannon* v. *Mathes, supra.*

"It therefore may be stated that the true rule of construction, which has been fully established by the authorities, is that any provision of the act, directly or indirectly relating to the subject expressed in the title, and having a natural connection therewith, and not foreign thereto, should be held to be embraced in it.

"We think the act in question embraces but one subject, and that subject may be fairly stated to be

394 BLACK & WHITE T. Co. *v.* STANDARD OIL Co. [25 Ariz.

the raising of revenue for the purpose of improving, building, and providing a fund for maintaining of public roads in the counties affected by the act. We think it may be said that all of the provisions of the act are directly and inseparably connected with the one purpose of raising revenue for the improvement, building, and maintaining of public roads."

The provision of the Constitution we are considering was before the Supreme Court in *Van Dyke* v. *Geary*, 244 U. S. 39–46, 61 L. Ed. 973, 37 Sup. Ct. Rep. 483, 486, and it was there said:

"Constitutional provisions requiring the subject of legislative acts to be embraced in the title are not to be given a strained and narrow construction for the purpose of nullifying legislation."

This court has considered this provision in the following cases: *Laney* v. *State,* 20 Ariz. 416, 181 Pac. 186; *Coggins* v. *Ely,* 23 Ariz. 155, 202 Pac. 391; *State Board* v. *Buckstegge,* 18 Ariz. 277, 158 Pac. 837; *Skaggs* v. *State,* 24 Ariz. 191, 207 Pac. 877. While in the last two cases the legislation was stricken down as not being expressed in the title, nothing said in either case will sustain appellant's contention. In the Skaggs case, under a title, "An act to establish a Penal Code," we held a civil statute could not be enacted; in the Buckstegge case, under a title, "An act providing for an old age and mothers' pension and making appropriation therefor," we held the legislature could not abolish all county hospitals and other eleemosynary institutions of the state as was undertaken. In both these cases the departure from the title was complete. The titles clearly indicated one thing, and the act thereunder provided for another thing, entirely out of harmony therewith.

Having come to the conclusion that the title of chapter 76 is single, as also the act, and that the provisions of the act are all either directly or indirectly connected with the subject of the act and

not incongruous therewith, we think we have successfully disposed of assignments Nos. 1, 2, 3 and 5, and that the act is not in violation of either section 13, part 2, article 4, or section 20, of the said article.

Assignment 4 is that said chapter 76 fails to fix the object for which such 50 per cent of the gasoline tax is to be expended and therefore offends that provision of section 3, article 9, of the Constitution, reading as follows:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the tax, to which object only it shall be applied."

As we read the provision of chapter 76 disposing of one-half of the three cents per gallon of gasoline tax to the counties, it "states distinctly the object of the tax" to be "for the maintenance of county roads and highways." *Martens* v. *Brady,* 264 Ill. 178, 106 N. E. 266.

We now come to the question of the effect of the Governor's veto. We will not set forth here the provisions of chapter 76 that were disapproved, but will refer to them by paragraph and subdivision as set forth in the forepart of the opinion; the part disapproved being printed in italics. The Governor vetoed or disapproved the provision of chapter 76 imposing a three-cent gasoline tax (and also the allocation thereof as made by the legislature), being paragraph (a) of subdivision 3, section 10. We think it goes without saying, and in this all parties seem to agree, the executive was without power to veto the imposition of such tax as made by the legislature. To state this proposition is enough to dispose of it. It needs no enlargement or explanation other than a reference to the section of the Constitution granting to the Governor the power to veto—section 7, article 5. As was said in *Fairfield* v. *Foster, ante,*

p. 146, 214 Pac. 319, he has two kinds of veto, one to the whole act and another to items when a bill presented to him "contains several items of appropriation." In attempting to veto the legislative imposition of three cents per gallon, he was not acting in a manner delegated to him by the Constitution, and his act was therefore ineffective, so the license tax of three cents, as made by paragraph (a), said subdivision and section, stands and must be collected by the gasoline dealers of the state, unless the action of the Governor in connection with other portions of said subdivision and section has the effect of relieving such dealers from that duty. It is axiomatic in law that what cannot be done directly may not be done by indirection, and if the executive veto does not extend to a tax levy it is difficult to understand how such tax levy could be affected by a veto applied to some other part of the law creating the tax.

The Governor also disapproved of paragraph (d) of said subdivision 3 of section 10, which provides (as a reference thereto shows) that dealers in gasoline shall pay the said three-cent tax to the Secretary of State, who shall turn over to the State Treasurer to be credited to the 25 per cent apportionment account one-quarter thereof, and one-quarter to the 75 per cent apportionment account of the general fund, and pay one-half of such tax to the several county treasurers in proportion to the amount received from the counties, for the maintenance of county roads and highways. The allotments of one-quarter of the three-cent gasoline tax to the 25 per cent and one-quarter to the 75 per cent apportionment accounts are clearly not appropriations. The former is appropriated by section 5 of chapter 76, and the latter, if appropriated at all, is by virtue of other provisions of the statute authorizing and

directing the board of supervisors to use it co-operatively with the state and United States in constructing highways and bridges within the boundaries of their county. The veto power no more extended to these two apportionments than it did to the legislative levy, or imposition of the tax, as they were not items of appropriation.

But it is said the provision of paragraph (d), said subdivision and section, giving to the counties one-half of the three-cent gasoline tax, is an item of appropriation within the meaning of section 7, article 5, of the Constitution, and may be stricken from the act by the veto power. This position is not tenable. An appropriation or items of appropriation that the Governor may decline to approve are of funds belonging to the state. It is provided in section 3, article 9, of the Constitution that the legislature shall provide by law for an annual tax, sufficient, with other sources of revenue, to defray the necessary, ordinary expenses of the state for each fiscal year, and that when such taxes are levied and collected they shall be paid into the state treasury in money only; and section 5 of said article 9 forbids the paying of any money out of the state treasury, except in the manner provided by law. By chapters 8 and 9, title 1, Civil Code of 1913, concerning the State Auditor and State Treasurer and their duties, the legislature has provided the manner of paying moneys out of the state treasury. Section 20, part 2, article 4, concerning general and special appropriation bills, has reference to the revenues of the state, and is the source of authority in the legislature to make appropriations out of moneys paid into the state treasury. The 50 per cent of the three-cent gasoline tax that goes to the county is not levied for a state purpose and does not become the state's money. It is collected by the gasoline dealers

and by them remitted to the Secretary of State, who pays one-half thereof to the State Treasurer to be apportioned as above stated, and remits the other one-half to the treasurers of the different counties from which it has been received. It is the counties' money, levied for a county purpose; it is as though the legislature had directed the county authorities to collect one and one-half cents tax per gallon on gasoline and apply it to the maintenance of the county's roads and highways, or as though the legislature had directed the county authorities to make a tax levy upon the property of the county to be used in building, improving, repairing and maintaining a public courthouse, or a county hospital for their indigent sick and disabled, or any other public purpose or use. Surely, no one would contend that an act of the legislature authorizing and directing a tax levy to buy grounds at a cost not to exceed $25,000 and to build thereon a courthouse by the county not to exceed $500,000 would be subject to the executive veto except as a whole. Such would not . be an appropriation containing different items as that term is used in the Constitution. It calls for the expenditure of money, it is true, but not money that the legislature has appropriated out of the biennial fund in the state treasury, put there to defray the necessary expenses of the state government. The item or items that may be disapproved are items of money, to be paid out of the state's money levied and collected for the purposes of the state and not expenditures the legislature may authorize and direct its political subdivisions to make. In *Commonwealth v. Powell*, 249 Pa. 144, 94 Atl. 746, the court, after holding the act therein involved did not violate the constitutional provision against plurality of subjects in title and context (an act regulating motor vehicles),

quoted from the Pennsylvania Constitution—and ours is the same—as follows:

"All other appropriations shall be made by separate bills, each embracing but one subject."

And said:

"That this provision of the Constitution was only intended to apply to the biennial appropriations made by the legislature out of the general revenues of the commonwealth. It has no application to a fund created for a special purpose and dedicated by the act under which such fund is to be created to a particular use. The appropriation of the fund so created continues as long as the act which dedicates it to a particular use remains in force."

It will be noticed that this gasoline tax is a continuing one, and the 50 per cent is dedicated to the particular use of maintaining county roads and highways. The contention of counsel that the definition of an "appropriation" as contained in the Fairfield case is broad enough to cover this 50 per cent allotment to the counties is not well founded. In that case we defined in a general way an "appropriation." That definition must be examined in view of the particulars of the case in which it was announced. One of the elements of the definition, although not particularly stressed, yet too apparent to be overlooked, was that the money appropriated was out of the general revenue of the state. Whether what was said in any case has any bearing or effect in another case or not depends upon the similarity of facts and circumstances of the cases. If the facts are the same, it is an authority; if different, it would be no authority. In all the cases that we have examined bearing upon the question as to what an appropriation is they have been concerning state funds collected for state purposes. Take the definition of an appropriation cited by counsel for appellee Secretary

of State, as found in *Menefee* v. *Askew,* 25 Okl. 623, 27 L. R. A. (N. S.) 537, 107 Pac. 159, as follows:

"An appropriation is an authority from the legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum out of a designated fund in the treasury in a given year to a specified object or demand against the state. . . . 'No particular expression or set form of words is requisite or necessary to the accomplishment of the purpose. . . . ' "

The question there was as to whether the legislature had, by proper and sufficient language, shown an intention to set aside out of the state treasury a definite sum to pay the salaries and expenses of the state game and fish warden, and the definition must be read with those facts before one to be properly understood. Another authority cited by same counsel is *Jobe* v. *Caldwell & Drake,* 93 Ark. 503, 125 S. W. 423–426, and it, too, involved funds in the state treasury and a demand against the state.

The validity of the Governor's veto as applied to certain parts of subdivision (a), section 10, has not been assigned as error, and was not argued before the court or in the briefs of counsel, but, in view of the situation and the probability that the officers whose duty it is to levy and collect these taxes will be in doubt as to what they should do, and to settle the matter beyond further dispute or doubt, we have concluded to pass upon the question. The Constitution provides that the Governor shall give his reasons for doing so, when he declines to approve of an item or items of an appropriation, and shall append his reasons to the bill. The reasons the Governor assigned for his disapproving and vetoing certain parts of subdivision (a), section 10, being the property tax levy, are set forth in his letter in the following language:

"Analysis of the condition of the state highway finances, as such information has been made available to this office, proves conclusively the requirement of emergent provision of funds, in an amount approximately of one and one-half millions of dollars, to complete road projects to which the state has been heretofore committed. In the light of further eliminations of appropriations contained in this act, which I am constrained to make for the reasons hereinafter set forth, and in the appreciation of the fact, that our state is at this time most unfortunately unable to bear the burden of new and additional taxes for road or other purposes, I have determined to meet the emergency, that the levy of ten cents upon each one hundred dollars of assessed valuation, shall be used exclusively in the construction and for the completion of those road projects to which the state has been committed. These projects lie in and through each of the counties of the state, and the expenditure of this fund for such purposes, to the exclusion of any division to the *75 per cent apportionment account,* is certainly in the interest not only of relieving the present chaotic condition of state highway finances but in the direct interest of road construction for the benefit of each of the counties of the state. To continue *the 75 per cent apportionment* during the present emergency would entail one of two consequences: Either a tax must be paid in excess of the ten-cent levy to finance state work, which I believe would add a burden unbearable at this time upon the people of the state, or the state highway department must limit itself in the construction of those projects to which the state has been committed, to the use of the 75 per cent fund within the confines of the respective counties. In some of the counties the *apportionment* is more than sufficient, and in others it is far too small, to enable the desired construction to be done, which, on the whole, would result in an utter lack of provision to meet the existing emergency.

"Without committing myself to an expression of an opinion upon the desirability of a permanent elimination of the 75 per cent fund or account, the following

ideas occur and are pertinent in this connection: The reasons which dictated the establishment of the 75 per cent fund have ceased to exist or are of little relative importance. Apprehension was formerly entertained that, if provisions were not made by statute for the equitable division among counties of road moneys, political manipulation would work to the undue advantage of the larger and more politically powerful counties and to the disadvantage of their weaker and smaller sisters. But the advent of federal co-operation in the building of state roads and the consequent supervision by the federal government, resulting in the establishment of the 7 per cent system and providing for the construction of an unified state system of roads, running through and benefiting all of the counties of the state, have entirely assured the respective counties of a fair and equitable division and expenditure of road moneys, which is at once to the interest of the several counties and of the entire state of Arizona.

"I disapprove and veto for reasons stated, that portion of section 10. . . . " (Italics ours.)

See section 10, *supra.*

It would seem from this letter and the reasons therein given that the Governor disapproved of the apportionment of 25 per cent of the levy to the state and 75 per cent thereof to the counties, but approved of the levy as a whole. If this veto be held good, and has the effect desired by him, the taxpayer will still pay ten cents on the dollar, as it was intended he should, but instead of its being apportioned one-quarter to the state and three-quarters to the counties, it would be covered into the state treasury to be checked out by the agents of the state; in other words, the veto would not only destroy the authority of the state engineer and the supervisors to expend 75 per cent of the levy, but it would also destroy the allotment, object and purpose of the levy *pro tanto.* As a matter of fact, the Governor did not veto or disapprove of the use of 75 per cent

of such levy for road purposes, but he objected, for economical and emergent reasons, to its being apportioned to the counties. He disapproved of the apportionment as made by the legislature and nothing else.

In the case of *Fulmore* v. *Lane,* 104 Tex. 499, 512, 140 S. W. 405–412, the court had under consideration the veto of the executive and, while holding that the power to veto an item or items was vested in the Governor it was said such power could not be extended beyond that; the court using the following language:

"The executive veto power is to be found alone in section 14, article 4, of the Constitution of this state. By that section he is authorized to disapprove any bill in whole, or, if a bill contains several items of appropriation, he is authorized to object to one or more of such items. Nowhere in the Constitution is the authority given the Governor to approve in part and disapprove in part a bill. The only additional authority to disapproving a bill in whole is that given to object to an item or items, where a bill contains several items of appropriation. It follows conclusively that where the veto power is attempted to be exercised to object to a paragraph or portion of a bill other than an item or items, or to language qualifying an appropriation or directing the method of its uses, he exceeds the constitutional authority vested in him, and his objection to such paragraph, or portion of a bill, or language qualifying an appropriation, or directing the method of its use, becomes noneffective."

As was said by us in *Fairfield* v. *Foster, supra,* referring to *State* v. *Holder,* 76 Miss. 158, 23 South. 643, as authority therefor, "the executive cannot veto a condition or proviso of an appropriation while allowing the appropriation to stand. That would be affirmative legislation, without even the concurrence of the legislature." The aptness of this lan-

guage is obvious, since in the present case the veto disapproves of the condition that 75 per cent of the levy be used under the direction of the state engineer and board of supervisors, and also a further condition, all too apparent from the context of the act, that it be used in the county where collected. We conclude that the veto is ineffectual.

The executive also disapproved of paragraphs (a) and (b) of subdivision 2, but, inasmuch as these subdivisions are purely tax-levying statutes, such disapproval did not have the effect of striking out these paragraphs.

The judgment of the lower court is affirmed.

McALISTER, C. J., concurs.

LOCKWOOD, Superior Judge, Dissenting.—I regret to state that I cannot concur with the majority of the court in the ultimate conclusion reached by them as to the validity of the gasoline tax. Had the matter involved been only a question raised in an action between private parties and one merely of individual interest, I should have contented myself with dissenting without expressing my reasons therefor, but since, as I view the case, the majority opinion lays down a rule of law in regard to the veto power which is unsound in logic, unsustained by the best authorities, and which, in effect, though not in words, nullifies the rule of *Callaghan* v. *Boyce,* 17 Ariz. 433, 153 Pac. 773, and *Fairfield* v. *Foster,* *ante,* p. 146, 214 Pac. 319, so recently decided by this court, in such a manner as to make it almost certain that for years to come there will be constant conflict and litigation between the executive and legislative branches of the state government, as to the extent and meaning of the special veto power, set forth in article 5, section 7, of the Constitution, I feel it my duty to give the grounds of my dissent.

So far as the majority opinion deals with the general unconstitutionality of the act, while a contrary decision would have been supported by perhaps the greater number of authorities, yet where the objection is one of form, even though it be of constitutional form, I believe the more modern and better rule is that the constitutionality of the act should be upheld, if possible, and that every reasonable intendment is in favor of it. The reason for this rule is, of course, the respect due the act of a co-ordinate branch of the government. I therefore concur with the majority that the act is not obnoxious to article 4, part 2, section 13, or to article 4, part 2, section 20, of the Constitution.

But when we consider the effect of the veto attempted to be exercised by the Governor the act of the executive is entitled to just as much respect as that of the legislative branch, for the same reason, and it would be proper to say that, as we indulge every intendment in favor of the constitutionality of the act as originally passed by the legislature, we should also have the same presumption in favor of the constitutionality of the veto.

We are taught in the study of logic that the greatest causes of faulty reasoning are: First, the failure on the part of the reasoner to lay down his definitions and fundamental principles, and test every argument by these admitted rules; and, second, the tendency to modify the principles or change the definitions to meet what seems to be the exigency of the particular case. In geometry, the most logical of all the sciences, we first determine our axioms and definitions, and then, in future problems, test every view presented by these axioms, and, unless the proposition agrees with them, we reject it as false, no matter how plausible it may be.

In logic, we learn the rules of the syllogism, and judge every argument advanced by them, and, unless it conforms to these rules, no matter how alluring the argument may be, we know that somewhere therein lurks a fallacy.

In this case, therefore, I shall advance two fundamental propositions, and when I have shown, as I believe I can, that they are true, I shall endeavor to test every argument, both *pro* and *con,* by them, and reject any theory of the law that contradicts them, no matter how plausible it may seem. The first proposition is this: Under the Constitution of Arizona, whenever the legislature says "Yes" to any appropriation of money, the Governor cannot be deprived of the right to say "No." If the appropriation be single, he must act on the bill as a whole, while if there be several items of appropriation, he may, if he desires, act on each separately without affecting the remainder of the bill. But, at the same time, and in some manner, this opportunity must be presented to the Governor before any money can be expended under the authority of the legislature. The second proposition is as follows: An appropriation is:

"The setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other."

The essential parts of the definition, no matter how the wording may be changed, are the "certain sum," the "specified object," and the "authority to spend." Any act, or part of an act, containing all three of these elements is, and always must be, an "appropriation," and nothing more or less, no matter how involved the grammatical construction or peculiar the language used.

In support of the first proposition, I need go no further than cite the case of *Fairfield* v. *Foster, ante,* p. 146, 214 Pac. 319, recently decided by this court, and the provisions of article 5, section 7, of the state Constitution. In *Fairfield* v. *Foster* we analyzed the veto power carefully, and anything I might add to the language of that case on this point would be mere elaboration and repetition.

To uphold the second proposition, I cite the following cases: *State* v. *Moore,* 50 Neb. 88, 61 Am. St. Rep. 538, 69 N. W. 373; *Clayton* v. *Berry,* 27 Ark. 129; *Stratton* v. *Green,* 45 Cal. 149; *State* v. *La Grave,* 23 Nev. 25, 62 Am. St. Rep. 764, 41 Pac. 1075; *Proll* v. *Dunn,* 80 Cal. 220, 22 Pac. 143; *Journal Pub. Co.* v. *Kenney,* 9 Mont. 389, 24 Pac. 96; *State* v. *Lindsley,* 3 Wash. 125, 27 Pac. 1019; *State* v. *King,* 108 Tenn. 271, 67 S. W. 812; *Ristine* v. *State,* 20 Ind. 328; *Campbell* v. *State, etc.,* 115 Ind. 591, 18 N. E. 33; *Shattuck* v. *Kincaid,* 31 Or. 379, 49 Pac. 758; *Henderson* v. *Board of Commissioners of State Soldiers' & Sailors' Monument,* 129 Ind. 92, 13 L. R. A. 169, 28 N. E. 127.

While the language differs somewhat in the various decisions, yet on analysis it will be found that, where the three elements I have mentioned are present, it has invariably been held that an "appropriation" of some nature was made.

Let us therefore consider the various attempted vetoes from every angle possible, but always remembering that, if any proposed solution violates one or both of the fundamental principles above set forth, no matter how plausible it may be, it must be fallacious. These various vetoes may be divided into seven subdivisions, as follows:

(1) Twenty-five per cent of such tax, herein provided for, shall be as paid into the treasury of the state of Arizona, deposited by the Treasurer of the state of Arizona, in a separate account, in the gen-

eral fund of the state, to be known and designated as 25 per cent apportionment account.

(2) Seventy-five per cent (75%) of such "state road tax fund" herein provided for, shall be apportioned to the several counties in the amount to each of 75 per cent of the taxes collected under this act, by said county, and such amount shall be subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges in the manner as in this act provided for the work in this act provided for within such county upon the authority and under the direction of the county board of supervisors of such county and the state engineer who are hereby charged with such responsibility.

(3) A one-half mill tax per each scheduled passenger capacity mile, which hereby is defined to mean a tax of one-half mill on each and every unit of seating capacity operating over each and every mile between fixed termini, or otherwise, in the state of Arizona, as per schedules on file with the Corporation Commission, or otherwise.

(4) That each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name, or in the name of others, or in the name of his representative or agents of this state in the sale, use or distribution, as dealers and distributors of gasoline or other distillates of crude petroleum shall not later than the fifteenth day of each calendar month render a statement to the Secretary of State of the state of Arizona of gasoline or other distillates of crude petroleum sold, used or distributed by him or them in the state of Arizona during the preceding calendar month, and collect a license tax of three cents per gallon on all gasoline and other distillates of crude petroleum so sold, used or distributed for use in motor propelled or motor driven vehicles, as shown by such statement in the manner and within the time hereinafter provided, which tax shall be added to the sale price of the dealer as herein defined when sold, used or distributed for such use in said motor propelled or motor driven vehicle only.

(5) And the State Treasurer shall place one quarter of the same in said 25 per cent apportionment account in the general fund.

(6) And one-quarter of the same to the account of the 75 per cent apportionment account of the general fund.

(7) And said Secretary of State shall promptly pay the remaining one-half of such tax to the several county treasurers of the state of Arizona, in proportion to the amount of such tax received from the respective counties, which shall be used by the said several counties as may be determined by the board of supervisors thereof, for the maintenance of county roads and highways.

Now, of course, it is obvious that the Governor was attempting to act under the special veto power set forth in article 5, section 7, of the Constitution. This grants the right to veto "items of appropriation" contained in any bill, regardless of its nature, but nothing else. If, therefore, any of the attempted vetoes above set forth are "items of appropriation" the veto must stand so far as that particular item is concerned, but otherwise it cannot.

It is too plain to need argument that the third and fourth clauses set forth are exactly the opposite of appropriations, being taxes. An appropriation, as was said before, is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and for no other," while a tax is the enforced contribution of persons and property levied by the authority of the state, for the support of the government, and for all public needs." 8 Words and Phrases, p. 6868. Therefore, the third and fourth clauses attempted to be vetoed, the act as a whole having been signed by the Governor, are, so far as the veto, in and of itself is con-

cerned, still a part of the law, subject to review on other constitutional grounds only.

The first, second, fifth, sixth and seventh sections are clearly not "taxes," but are they "appropriations"? It is contended by counsel on one side that these provisions are merely "apportionments," or "allocations," while it is urged with equal vigor by opposing counsel that they are true "appropriations."

"Apportionment" is defined as being "to divide and assign in just proportion." International Dictionary. Clearly, every appropriation contains an apportionment, but, unless the words are synonymous, the converse cannot be true. Taking the definitions of the two terms above given, the addition required to make an "apportionment" an "appropriation" is the authority given the executive officers to actually *spend* the money.

The first clause regarding the 25 per cent portion of the ten-cent tax, standing by itself, would not authorize the auditor to approve the expenditure of a single penny therefrom. It simply provides for the payment into a certain segregated part of the general fund of the proceeds of certain taxes. The *expenditure* of those funds is authorized by the provisions of sections 2, 4, 5 and 11 of the act. Therefore the attempted veto of the portion of section 10 of the act referring to the "25 per cent apportionment account" was not the veto of an appropriation, and cannot stand. The same necessarily follows as to the attempted veto of the disposition of the portions of the gasoline tax going to the 25 per cent and 75 per cent apportionment accounts, being clauses 5 and 6.

Let us now examine the veto of the application of 75 per cent of the proceeds of the ten-cent tax. Is the part vetoed an appropriation? A casual read-

ing of the language, bearing in mind our definition of an appropriation, answers the question. Would the auditor approve a demand on that fund for work of the class set forth in the vetoed portion, if approved by the supervisors and the state engineer, as set forth therein? Obviously, yes. And if his authority was challenged, would he not justify it by that section, and none other? If the vetoed portion of the section be stricken from the act, there is nothing, either in the act itself or the general statutes, or previous session laws which would authorize the expenditure of a single penny of that particular money. How can it be said that the language which alone authorizes the expenditure of over half a million dollars of public money, strictly limiting where, how and by whom it shall be spent, is not an appropriation? It seems to me that the majority of the court have misread the clause referring to the 75 per cent of the property tax which was vetoed. In their opinion they say "the latter, if appropriated at all, is by virtue of other provisions of the statute authorizing the board of supervisors to use it co-operatively with the state and the United States in constructing highways and bridges within the boundaries of their counties. The vetoed portion reads as follows:

"Seventy-five per cent (75%) of such 'state road tax fund,' herein provided for, shall be apportioned to the several counties in the amount to each county of seventy-five per cent of the taxes collected under this act, by said county, and such amount shall be *subject to be paid out* for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges in the manner as in this act provided for the work in this act provided for within such county upon the authority and under the direction of the county board of supervisors of such county and the state engineer who are hereby charged with such responsibility."

Strike that portion from the act, and it is impossible to find anywhere within its four corners any authority whatever which would justify the expenditure of the 75 per cent. Leave it in, and, as I stated before, both the Auditor and Treasurer would be fully justified in approving, and indeed would be compelled to approve, demands on that fund agreed to by the supervisors and state engineer.

If a vetoed provision authorizes expenditures which cannot be made in its absence, I am certainly at a loss to know what to call it, except an appropriation of money.

Apply the other test given, that where the legislature says "yes" to the expenditure of money, the Governor cannot be denied the right to say "No." Since several expenditures are set forth in the act, he cannot be compelled to act on it as a whole. Is there any other manner in which the Governor can object to the expenditure of that particular money alone except by a veto of the very section he did decline to approve? Can any other clause or clauses of the act be pointed out, a veto of which would prevent the expenditure of this particular amount, while yet leaving all other expenditures and provisions of the act in full force? If these two questions can be answered in the negative, as it is apparent they must, then it follows, as the day the night, that the clause, being an authorization of the expenditure of money, and being the only one the striking out of which would prevent the spending of that particular money alone, is subject to the veto of the Governor.

But the majority seems to be of the opinion that the Governor exercised his right because he disapproved of the condition of the appropriation, viz., that part of the money should be spent under one authority and part under another, and cite the case of *State* v. *Holder,* 76 Miss. 158, 23 South. 643, ap-

proved by us in *Fairfield* v. *Foster, supra,* to the effect:

"The executive cannot veto a condition or proviso of an appropriation, while allowing the appropriation itself to stand. That would be affirmative legislation without even the concurrence of the legislature."

The quotation is indeed the law, and, as we illustrated, when the Governor objects to a proviso, his only method of using the veto is to disapprove both appropriation and proviso. Had the Governor, in this case, selected such portions of the vetoed section only as gave joint control, and stricken them out, leaving the appropriating clause, the veto would indeed have been void. However, he followed here the exact course taken by a previous Governor in the illustration given in *Fairfield* v. *Foster,* and vetoed both proviso and appropriation.

I have yet to learn that, because any officer acts legally, but gives the wrong reason for his action, or believes that the result will be different from what it is as a matter of law, his act is void. If we are to say that the legality of a veto is to be tested by what we believe the Governor *would have done* had he known more fully the results thereof, and not by what he actually *did* do, it is indeed judicial legislation. For the purpose of determining the legality of the veto, it is utterly immaterial what the Governor *might* have done, or *why* he acted. We are concerned only with *how* he acted. If he had the legal right so to act, his veto must stand, no matter what the consequences or the reasons impelling his actions.

Let us now consider the· attempted veto of the disposition of the proceeds of the gasoline tax. I have already referred to the apportionment of the amount going to the "25 per cent apportionment

fund," and to the "75 per cent apportionment account of the general fund." When we come to the vetoed clause referring to the money to go to the counties and again apply our test, the same situation applies as to the 75 per cent of the ten-cent property tax. The vetoed section positively and clearly gives the supervisors authority to spend the money. Should the supervisors of any county spend part of this money, and suit be brought against them under the provisions of paragraph 2442, Revised Statutes of Arizona of 1913, under what law would they justify? Under the vetoed section above referred to, and none other.

The majority opinion, referring to the gasoline tax, says:

"An appropriation or items of appropriation that the Governor may decline to approve are of funds belonging to the state."

And further:

"The 50% of the three-cent gasoline tax that goes to the county is not levied for a state purpose and does not become the state's money. It is collected by the gasoline dealers and by them remitted to the Secretary of State, who pays one-half thereof to the State Treasurer to be apportioned as above stated, and remits the other one-half to the treasurers of the different counties from which it has been received. It is the counties' money levied for a county purpose," etc.

I do not find that the special veto power is limited by the Constitution to appropriations of money made for state purposes only. The language of the Constitution is:

"If *any* bill presented to the Governor contains several . . . appropriations of money, he may object to one or more of such items while approving other portions of the bill." Const., art. 5, § 7.

The act in question certainly was a bill, presented to the Governor, containing several items of appropriation.

Is it seriously contended that, when a state-wide tax is levied by the legislature, and the act levying the tax provides just how the money shall be distributed, for what purpose it shall be expended, and by whom, that merely because the money is directed to be spent in certain counties, and the supervisors, within the limits prescribed by the legislature, are charged with the duty of seeing that it is spent for the purpose fixed by the legislature, it is not an appropriation? I cannot find where such a proposition is supported by any language of the ·Constitution or any decision of a court of last resort.

The case of *Commonwealth* v. *Powell*, 249 Pa. 144, 94 Atl. 746, does not deal with the veto power at all, but merely discusses the question of whether a special appropriation of the character set forth therein violates the constitutional provision that appropriation bills, other than the general, should have but one subject. Nowhere in the case is it even intimated that there was not an appropriation.

Suppose, for example, the legislature levies a tax of any nature and then provides that the proceeds shall be spent in the various counties for the erection of new courthouses, so much to each county, under the direction of the supervisors, is it contended that the Governor could not veto each or any of the amounts so provided to be spent merely because the proceeds were to be used for county purposes, under the supervision of the county authorities?

Is the provision of the general appropriation bill for the support of the public schools not subject to veto because the money is apportioned to the counties, and spent in the particular districts under the direction of the county superintendent of schools?

The counties are merely political subdivisions of the state which are created and changed from time to time as the legislature may see fit. They have no power or authority, nor even existence, save and as the legislature provides. That body has and frequently exercises the right to direct even the expenditure of money raised wholly within the county, and under a levy made by the supervisors. The counties and all the officers thereof are only the agents of the state.

It is said "it is the counties' money, levied for a county purpose." Yes; but it did not become the counties' money until after the legislature *appropriated* it to them, nor was the county purpose established until *after* the legislature had spoken. It was state money, levied by state authority, and the counties and their officers can only justify the expenditure by reference to the act of the legislature authorizing it.

It is evident, from the foregoing, that within this act there are at least three positive and unequivocal appropriations of money. The first was the specific sum of $1,550,000 for certain purposes set forth in the various sections of the act. The second was of 75 per cent of the proceeds of the ten-cent property tax levy, and the third was of 50 per cent of the gasoline tax. Of course it cannot be contended that, because the latter two are expressed in percentages instead of dollars that they are not appropriations. "That is certain which can be made certain." *State ex rel. Ledwith* v. *Searle*, 79 Neb. 111, 112 N. W. 380. The next question is, Are they "items of appropriation"? The majority of the court has already held, and with them I concur, that the act embraces but one "subject of appropriation" in the purview of article 4, part 2, section 20. If there be three appropriations for separate objects coming under one subject within

one bill, can they be, within the definition of *Fairfield v. Foster,* anything but items of that subject?

From the above it appears that there were within this act at least three separate "items of appropriation" and the Governor, acting within his constitutional authority, has vetoed two of them.

What is the effect on the act as a whole? We have a property tax levy of ten cents on the hundred dollars, with provision made for the disposition of one-fourth thereof, but no provision for the disposal of the balance. We have a gasoline tax of three cents per gallon, with provision made for the disposition of one-half thereof, but no provision for the disposal of the balance. There is neither "apportionment" nor "appropriation" thereof.

What, then, shall be done with the proceeds of the taxes? The treasurer may receive them, truly, but he can only permit a fraction thereof to be spent, and, so far as the balance is concerned, it is like Mahomet's coffin, suspended between heaven and earth, belonging to no particular fund and having no particular purpose. It necessarily falls within the inhibitions of article 9, sections 3 and 9, of the Constitution.

But the taxes as levied were not divided by the legislature. Had the gasoline tax itself provided that there should be a one and one-half cent levy for the counties and the same amount for the two apportionment funds, the first levy might fail without affecting the second one. And so would it be with the property tax. But for us to make the division which the legislature failed to make would be a judicial and not a legislative tax. The chief purpose for which the two taxes were levied having failed, and they being indivisible, the levies as a whole necessarily fail, under the provisions of the Constitution above cited.

25 Ariz.—27

The thought naturally occurs that the final results of the above conclusions would be disastrous to the state, in that the highway department would be substantially without funds. Such indeed might be the result, but in my humble opinion it would be far more disastrous ultimately, if in our natural and proper desire to avoid the Scylla of crippling temporarily the highway department, we fall into the Charybdis of a construction of the Constitution not consonant with fundamental principles, which will inevitably lead to future misunderstandings and conflicts between the legislative and executive branches of government, and a perpetuation of the particular evils, again shown forth in the very language of the highway bill, and the circumstances of its passage, which article 5, section 7, of the Constitution was adopted to prevent.

Believing as I do, for the reasons above stated, that the veto of the Governor of the clauses of the act appropriating 75 per cent of the property tax and 50 per cent of the gasoline tax was valid, and that its effect was to render void the gasoline and property tax levies, under article 9, sections 3 and 9, of the Constitution, I hold that the action of the superior court of Maricopa county in sustaining the demurrer to plaintiff's complaint should be reversed, and the case remanded to that court, for proceedings not inconsistent with this opinion.