833 P.2d 20

Senator Peter RIOS, in his individual capacity and as President, Arizona State Senate, Petitioner,

v.

Governor J. Fife SYMINGTON, III, Real Party in Interest,

and

Tony West, Treasurer of the State of Arizona; Arizona Department of Economic Security; Arizona Department of Health Services; Arizona Department of Building and Fire Safety; Arizona Health Care Cost Containment System; Arizona Department of Insurance; Arizona Department of State Parks; Arizona Department of Corrections; Arizona Department of Public Safety; Arizona Department of Revenue; Arizona Department of Liquor Licenses; Arizona Department of Racing; Arizona Radiation Regulatory Agency; Arizona Department of Emergency and Military Affairs; Lavere O. Connolly, as Treasurer of Apache County; Marsha Bonham, as Treasurer of Cochise County; Connie Fry, as Treasurer of Coconino County; Priscilla M.L. Knuckey, as Treasurer of Gila County; Nellie Plasencio, as Treasurer of Graham County; Jackie D. Quinn, as Treasurer of Greenlee County; Gearan Harris, as Treasurer of La Paz County; Glenn Stapley, as Treasurer of Maricopa County; Dora Goodmiller, as Treasurer of Mohave County; J.R. Despain, as Treasurer of Navajo County; James Lee Kirk, as Treasurer of Pima County; Jim L. Turnbull, as Treasurer of Pinal County; Acencion "Chon" Canchola, as Treasurer of Santa Cruz County; Richard Jacobs, as Treasurer of Yavapai County; Teresa Poland, as Treasurer of Yuma County; Respondents.

No. CV–92–0129–SA.

Supreme Court of Arizona, En Banc.

June 30, 1992.

**4**

Lewis and Roca by Janet A. Napolitano and Patricia M. Anania, Senate Majority Counsel, and Daniel J. Adelman, Asst. Majority Counsel, Phoenix, for Senate President Peter Rios.

Snell & Wilmer by John J. Bouma, James R. Condo and Matthew P. Feeney, Phoenix, for Governor J. Fife Symington, III.

Grant Woods, Atty. Gen. by Rebecca White Berch, Sol. Gen., Phoenix, for respondents.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

On March 17, 1992, Governor Fife Symington convened the seventh special session of the Fortieth Legislature of the State of Arizona to consider "[t]he adjustments necessary to produce a balanced state budget for fiscal year 1991–1992" and "[t]o make appropriations and necessary statutory changes to address the overcrowding situation in the state's prison system." In response to the Governor's call, the Legislature enacted House Bills 2001 and 2002. House Bill 2001 is primarily a "fund transfer" bill that directs the transfer of various sums of money from special funds to the state's general fund. It also directs the transfer of county-held Racketeer Influenced Corrupt Organization (RICO) forfeiture monies to the RICO account of the Department of Public Safety, and adjusts the "in lieu" tax for the state compensation

fund. House Bill 2002 amends the general appropriations bill for fiscal year 1991–1992, in part creating new appropriations and in part directing various increases and decreases in previous appropriations.

On March 28, 1992, Governor Symington signed both bills into law. In doing so, however, the Governor exercised his line item veto power under article 5, § 7 of the Arizona Constitution to disapprove selected provisions of each bill. As required by the Constitution, Governor Symington transmitted a message to the Legislature containing the reasons for his line item vetoes. At the same time and in the same message, Governor Symington instructed various state agencies to revert specified sums of money to the general fund for the purpose of bringing the total budget in line with the Governor's projected revenues.

Under article 5, § 7 of the Arizona Constitution, the Legislature may override the Governor's veto by a two-thirds vote of each House. No override vote was taken. Instead, the President of the Arizona Senate, Senator Peter Rios, filed this special action directly in this court seeking a judicial declaration that the Governor's vetoes and reversion orders are invalid.

## SPECIAL ACTION JURISDICTION

This court has original jurisdiction over the issuance of extraordinary writs [1] against state officers. Ariz. Const. art. 6, § 5(1); *see also Arizona Corp. Comm'n v. Superior Court,* 107 Ariz. 24, 25, 480 P.2d 988, 989 (1971). Although the Legislature's usual remedy when confronted with a Governor's veto would be to attempt an override, we conclude that, in this instance, it is not the Legislature's exclusive remedy. In limited circumstances, a judicial proceeding by way of special action may be appropriate to test the constitutionality of executive conduct. Because this case involves a dispute at the highest levels of state government, the issues are substantial and present matters of first impression in this

state, and a prompt determination is required, we accepted jurisdiction following oral argument.[2]

While we accepted jurisdiction to provide future guidance to the Executive and the Legislature, we caution that we did not do so lightly. We agree with the words of the Florida Supreme Court speaking in a similar case:

[I]t would be a serious mistake to interpret our acceptance of jurisdiction in this cause as a general willingness to thrust the Court into the political arena and referee on a biennial [in Arizona, annual] basis the assertions of the power of the executive and legislative branches in the appropriations act.... [F]uture attempts to invoke this Court's jurisdiction on similar grounds will be viewed with great circumspection.

*Brown v. Firestone,* 382 So.2d 654, 671 (Fla.1980).

## DISCUSSION

### I. The Veto Power

The foundation of our state government, like that of the federal government, is laid on the simple yet elegant premise that power shall be distributed between three coordinate branches of government. Article 3 of the Arizona Constitution sets forth this distribution of power:

The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Alexander Hamilton's observation in *The Federalist No. 78* is equally applicable to Arizona: the Legislature commands the power of the purse. With regard to that power, the language of our Constitution is plain. The lawmaking power vests solely

---

1. The traditional writs of certiorari, mandamus and prohibition are now obtained by "special action." *See* Rule 1, Ariz. R.P.Spec.Act., 17B Ariz.Rev.Stat.Ann. (A.R.S.) (1988).

2. We note that the Governor and the other respondents have not challenged Senator Rios' standing to bring this action. Therefore, we do not address any potential standing issues.

in the Legislature, *see* Ariz. Const. art. 4, Pt. 1, § 1, and ordinarily public funds may be expended only by legislative authority. *See* Ariz. Const. art. 4, Pt. 2, § 20 (appropriations bills); Ariz. Const. art. 9, § 5 (power to contract debts); *see also Le-Febvre v. Callaghan*, 33 Ariz. 197, 204, 263 P. 589, 591 (1928) ("Under our system of government, all power to appropriate money for public purposes or to incur any indebtedness therefor ... rests in the legislature."). The Legislature, in the exercise of its lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect.

Although the power of appropriation is vested in the Legislature, our Constitution does not deny the Executive participation in the appropriation *process*. Article 5, section 7 grants to the Governor a special veto power over items of appropriation: "If any bill presented to the Governor contains several items of appropriations of money, he may object to one or more of such items, while approving other portions of the bill." The purpose of the line item veto, as it relates to the general appropriations bill, is to prevent "pork barreling" by the Legislature. *See Fairfield v. Foster*, 25 Ariz. 146, 152–53, 214 P. 319, 322 (1923) ("In plain English, [the drafters of our Constitution] wished the Governor to have the right to object to the expenditure of money for a specified purpose and amount, without being under the necessity of at the same time refusing to agree to another expenditure which met his entire approval."). The framers of the Constitution thus established an additional executive check on the appropriation process, allowing the Executive to "line out" items of appropriation to which he or she objects. This veto power in turn is tempered by the Legislature's ability to override such vetoes by a two-thirds vote. *See* Ariz. Const. art. 5, § 7.

### A. *House Bill 2001*

House Bill 2001 directs the transfer of funds from 61 different special funds to the general fund and also directs the transfer of county-held RICO forfeiture monies to the RICO account of the Department of Public Safety. The Governor vetoed 5 of the special fund transfers and the RICO transfer. We hold that the Governor's veto of the special fund transfers is valid but that his veto of the RICO transfer is invalid. We discuss the special fund transfers separately from the RICO fund transfer.

### 1. The Special Fund Transfers

The five vetoed transfers are:

(1) Section 3, number 8: $70,000 from the department of mental retardation capital investment fund established by A.R.S. § 4–116.

(2) Section 3, number 13: $392,300 from the mobile home relocation fund established by A.R.S. § 33–1476.02.

(3) Section 4, number 12: $6,200 from the donations fund of the Arizona health care cost containment system (AHCCCS) and long-term care system fund established by A.R.S. § 36–2913.

(4) Section 4, number 18: $16,300 from the department of insurance computer system fund established by Laws 1990, chapter 69, § 1.

(5) Section 4, number 35: $2,200 from the land and water conservation surcharge fund established under the authority of A.R.S. § 41–511.26.

Our initial inquiry is whether the creation of the special funds constituted appropriations. Our second inquiry, assuming the acts creating the special funds are appropriations, is whether the Governor may properly line item veto transfers from those funds.

### a. *The Creation of Each Special Fund Constituted an Appropriation*

An appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." *Hunt v. Callaghan*, 32 Ariz. 235, 239, 257 P. 648, 649 (1927) (citations omitted). "[N]o specific language is necessary to make an appropriation, for the test is

... whether or not the people have expressed an intention that the money in question be paid." *Windes v. Frohmiller*, 38 Ariz. 557, 560, 3 P.2d 275, 276 (1931). "The essential parts of the definition, no matter how the wording may be changed, are the 'certain sum,' the 'specified object,' and the 'authority to spend.' Any act, or part of an act, containing all three of these elements is, and always must be, an 'appropriation.'" *Black & White Taxicab Co. v. Standard Oil Co.*, 25 Ariz. 381, 406, 218 P. 139, 148 (1923) (Lockwood, J., dissenting).

We now apply the above definition to the enabling statutes of the 5 special funds at issue.

#### i. Department of Mental Retardation, A.R.S. § 4–116.

The enabling statute provides in part:
[A]ll receipts derived from club licenses and applications therefor are appropriated to the department of mental retardation for buildings, equipment or other capital investments.

This statute creates an appropriation because: (1) it specifies a certain sum of money ("all receipts"); (2) for a specified object ("buildings, equipment or other capital investments"); and (3) creates an authority to spend ("all receipts ... *are appropriated*").

#### ii. Mobile Home Relocation Fund, A.R.S. § 33–1476.02.

The enabling statute provides in part:
The mobile home relocation fund is established consisting of monies collected pursuant to § 33–1476.03. [Section 33–1476.03 establishes an assessment against owners of mobile homes based on the property value of the home].
Fund monies shall be used to pay premiums and other costs of purchasing, from a private insurer ..., insurance coverage for tenant relocation costs....
If such insurance is not available, ... the fund shall be used to make direct payments for tenant relocation costs.

This statute creates an appropriation because: (1) it sets aside a certain sum of money (property taxes collected pursuant to § 33–1476.03); (2) for a specified object (to pay the cost of insurance for tenant relocation or make direct payments if insurance not available); and (3) creates an authority to spend ("Fund monies *shall be used* ...").

#### iii. AHCCCS System Fund, A.R.S. § 36–2913.

The enabling statute provides in part:
There is established the Arizona health care cost containment system and long-term care system fund.
[The fund is comprised of 9 different income sources including county donations, state donations, monies drawn against state appropriations to AHCCCS, gifts and donations, federal monies, interest on the fund and monies paid by owners of eligible businesses.]
The fund shall be used to pay administrative and program costs associated with the operation of [AHCCCS].

This statute creates an appropriation because: (1) it sets aside a certain sum of money (albeit from 9 different sources); (2) for a specified object (to pay AHCCCS administrative and program costs); and (3) creates an authority to spend ("The fund *shall be used* ...").

#### iv. Department of Insurance Computer Fund, Laws 1990, ch. 69, § 1.

The enabling legislation provides in part:
Surcharges [on licenses and certificates of authority] assessed by the director of the department of insurance and deposited in the department of insurance computer system fund pursuant to Laws 1987, chapter 260, section 1 shall be used to complete the computer system of the department....

This statute creates an appropriation because: (1) it sets aside a certain sum of money (surcharges on licenses and certificates of authority); (2) for a specified object (to pay for completion of the department's computer system); and (3) creates an authority to spend ("Surcharges ... *shall be used*").

v. Land & Water Conservation Surcharge Fund, A.R.S. § 41–511.26.

The enabling statute provides:

The state of Arizona, its agencies, counties, cities and towns are granted authority to participate in the 'Land and Water Conservation Fund Act of 1965' as enacted by Public Law 88–578, eighty-eighth Congress.

Public Law 88–578 (currently codified at 16 U.S.C. § 460*l*–4 to 460*l*–11 (1988)), provides in part at 16 U.S.C. § 460*l*–8(a):

The Secretary of the Interior ... is authorized to provide financial assistance to the States from moneys available for State purposes. Payments may be made to the States by the Secretary as hereafter provided, subject to such terms and conditions as he considers appropriate and in the public interest to carry out the purposes of sections 460*l*–4 to 460*l*–11 of this title, for outdoor recreation: (1) planning, (2) acquisition of land, waters, or interests in land or waters, or (3) development.

The specific language of A.R.S. § 41–511.26 does not present as clear a case for an appropriation as does the language creating the other 4 special funds. However, as we have noted, no specific language is necessary to create an appropriation. The only requirement is that the statutory language disclose a legislative intent to set aside a certain sum for a specified object in such a manner that the executive officers are authorized to spend that money. We believe that such an intent is shown here because, when viewed in conjunction with the federal statute, the state statute authorizes the creation of a fund currently financed by local governments for the purpose of developing outdoor recreation and vests the power to spend that fund in the State Parks Board (pursuant to A.R.S. § 41–511.04A(14)).

■ Thus, the creation of each special fund at issue here was an appropriation. In each case, the Legislature set aside a

certain sum of money for a specified object and created an authority to spend that money.[3] Indeed, it would be difficult to conclude otherwise. The language of article 9, section 5 of our Constitution, that "[n]o money shall be paid out of the State treasury, except in a manner provided by law," means "that the people's money may not be expended without their consent either as expressed in the organic law of the state or by constitutional acts of the legislature *appropriating such money for a specified purpose.*" *Crane v. Frohmiller,* 45 Ariz. 490, 495–96, 45 P.2d 955, 958 (1935) (emphasis added). That the Legislature has created a special fund to meet a specified object means, quite literally, that it has made an appropriation. Nor is it objectionable that the Legislature has not specified a sum certain in the enabling statutes because the specific amount in each special fund may be ascertained at any given time. "That is certain which can be made certain." *Black & White Taxicab,* 25 Ariz. at 416, 218 P. at 151 (Lockwood, J., dissenting) (citation omitted).

Having determined that the special funds at issue were created by acts of appropriation, we turn now to the more difficult question of whether the Governor properly exercised his line item veto power over the Legislature's transfers from those funds.

b. *The Transfers from the Special Funds Are Items of Appropriation Subject to the Governor's Line Item Veto Power*

■ The Arizona Constitution provides that "[i]f any bill presented to the Governor contains several items of appropriations of money, he may object to one or more of such items, while approving other portions of the bill." Ariz. Const. art. 5, § 7. The question we must answer is whether a transfer from a previously-made appropriation constitutes an "item of appropriation" subject to the line item veto. We hold that it does.

---

**3.** From the record before us, it appears that no further legislative action was required to autho-

rize spending from these 5 special funds.

Viewed in isolation, the fund transfers themselves are not clearly "items of appropriation," because the transfers themselves do not constitute a legislative grant of spending authority, much less state a specified sum of money to be devoted to a specified purpose. However, we do not believe that such a narrow view reflects the proper interplay between the legislative and executive branches. When the Legislature transfers monies from a previously-made appropriation, the obvious effect is to reduce the amount of the previous appropriation. The Constitution does not permit such reductions free of gubernatorial oversight. To hold otherwise would permit the Legislature to do indirectly that which it may not do directly, and would seriously limit the Executive's constitutional role in the appropriation process.

If we were to accept the argument that such transfers are not subject to the line item veto, a future Legislature could, for example, enact an appropriation bill and, knowing the Governor's views and priorities, appropriate a sufficient amount for a given purpose so as to gain the Governor's approval, rather than a veto. The Legislature could then later direct that some or all of that fund be transferred to another fund. By placing the transfer provision within a larger transfer bill, the Legislature could evade the Governor's line item veto power notwithstanding the fact that the later transfers completely alter the original appropriation. Such procedures, if authorized, would eviscerate the line item veto power which the Constitution intended the Governor to have. Although we are urged to construe the Governor's line item veto narrowly and strictly, we hold that it should be construed in such a way as to carry out the obvious constitutional intent.

In our view, if the Governor's constitutional power to line item veto an appropriation is to mean anything, the Governor must be constitutionally empowered to line item veto a subsequent reduction or elimination of that appropriation. Therefore, we hold that the Governor validly vetoed the five special fund transfers in House Bill 2001.

## 2. The RICO Accounts

The Governor also vetoed Section 7 of House Bill 2001, which provides in part:

[T]he county treasurer of each county in this state shall transfer to the state treasurer for deposit in the racketeer influenced corrupt organizations (RICO) account of the department of public safety donation fund all monies in the county treasury that are held by the county for the department of public safety or any other state agency as a result of any seizure or forfeiture of property in a criminal or civil proceeding.

The statute creating these accounts is A.R.S. § 13–4315, of which subsection (A) provides in part:

Any property, including all interests in property, forfeited to the state under this title shall be transferred as requested by the attorney for the state to the seizing agency, to the agency employing the attorney for the state or to the political subdivision bringing the action. . . .

■ The purpose of this statute is to provide for the allocation of forfeited property among the state's various law enforcement agencies and political subdivisions. In contrast to the specific anti-racketeering funds established pursuant to A.R.S. §§ 13–2314.01 and –2314.03, § 13–4315 simply provides that the state may transfer property to law enforcement agencies and political subdivisions to assist in anti-racketeering investigations and prosecutions.

Although certain proceeds from the sale of forfeited property (or the property itself if that property is money) may ultimately be deposited into county anti-racketeering funds earmarked for specific purposes, *see* A.R.S. § 13–4315(A)(2) & (B)(1), the original transfer of the property from the state to the county is much less specific. The Legislature did not express its intent that the original transfer be of a specific amount or for a specified purpose and, therefore, we hold that A.R.S. § 13–4315 is not an appropriation.

Because A.R.S. § 13–4315 itself is not an appropriation, House Bill 2001's transfer of the county RICO forfeiture accounts to the

RICO account of the Department of Public Safety donation fund is not an item of appropriation subject to the Governor's line item veto power. In this instance, the Legislature has not altered a previous appropriation; it has merely ordered the reversion of property held by the counties on the state's behalf. Accordingly, we hold that the Governor's veto of the RICO funds is invalid.

### B. *House Bill 2002*

House Bill 2002 amends over 100 items in the general appropriations bill (Laws 1991, ch. 287) for fiscal year 1991–1992. The Governor vetoed 10 of these items, affecting four state agencies: Department of Health Services (DHS), Arizona Health Care Cost Containment System (AHCCCS), Department of Corrections (DOC), and Department of Public Safety (DPS). The amendments take three general forms: 1) new appropriations; 2) increases in previous appropriations; and 3) decreases in previous appropriations. We hold that the Governor's vetoes of the 10 items in House Bill 2002 are valid.

The Governor's vetoes may be summarized as follows:

*DHS* (Section 26):

(1) Agency-wide lump sum reduction of $717,200.

*AHCCCS* (Section 28):

(1) Administration: lump sum reduction of $805,400.

(2) Administration: $391,700 decrease in general fund appropriation (from $25,214,300 to $24,822,600).

*DOC* (Section 86):

(1) Agency-wide lump sum reduction of $1,018,300.

(2) Adult institutions: new appropriation of $205,800 from state charitable, penal and reformatory land earnings fund.

(3) Adult institutions: $303,700 increase in penitentiary land fund appropriation (from $936,400 to $1,240,100).

(4) Adult institutions: $509,500 decrease in general fund appropriation (from $196,087,400 to $195,577,900).

*DPS* (Section 90):

(1) New appropriation of $636,800 from drug and gang enforcement account of the criminal justice enhancement fund.

(2) New appropriation of $734,200 from RICO account of the DPS donation fund.

(3) $6,684,500 decrease in general fund appropriation (from $43,999,600 to $37,315,100).

The Governor clearly has authority to line item veto new appropriations under Article 5, section 7 of our Constitution, and counsel for Senator Rios conceded this point at oral argument. We also think it is equally clear that the veto power extends to an increase of an earlier appropriation, because it is, in essence, a new appropriation. Again, counsel for Senator Rios conceded this point.

This leaves us with the vetoed *decreases* in spending authority. Three of the decreases were lump sum reductions and four reduced specific previously-appropriated amounts. Senator Rios contends that the Governor has no authority to veto these reductions because to do so would "substitute in their place other reductions that the legislature had considered and not approved."

It is true that the Governor has no power to *alter* an appropriation. *See Fairfield v. Foster,* 25 Ariz. 146, 157, 214 P. 319, 323. However, *Fairfield* only prohibits the Governor from lining out an item *and replacing it with his own, different amount. Fairfield* does not speak to the issue here, where the Governor has lined out *a reduction amending a previous appropriation.* The parties have cited no authority directly on point, and we have found none. We therefore address this issue as one of first impression.

The Constitution speaks to bills containing "items of appropriations." Ariz. Const. art. 5, § 7. The question we must answer is whether the legislative reduction of a previously approved appropriation is itself an item of appropriation subject to the Governor's line item veto power.

We reiterate preliminarily that the power to appropriate funds is exclusively a legislative function, subject to executive veto which, in turn, is subject to legislative override. Logically, the power to appropriate includes the power to amend an appropriation, and we agree that such power is also exclusively a legislative function. However, we conclude here that to prevent the Governor from vetoing an amendment to an appropriation would unlawfully allow the Legislature to accomplish indirectly that which it could not accomplish directly. To hold otherwise would give the Legislature plenary authority over appropriations, a result clearly not intended by the Constitution.

Ours is a government of checks and balances. If we follow the petitioner's argument to its logical conclusion, the end result is that the Legislature may circumvent the Governor's veto power and encroach upon the Executive's constitutional right to participate meaningfully in the appropriation process. The framers of our Constitution did not intend such a result.

We reject the argument that the Governor's ability to veto the entire bill precludes valid use of the line item veto. The line item veto with respect to appropriations was created precisely so the Governor would not be faced with an all-or-nothing acceptance of the entire bill. The Constitution specifically contemplates line item vetos for bills containing several items of appropriations. *See* Ariz. Const. art. 5, § 7. The Legislature, if it chooses, may override one or more of the Governor's line item vetoes and reinstate the amended appropriations. This procedure focuses the debate on those items the Legislature deems most important, and better preserves the balance of power.

Finally, we reject the argument that because the net effect of the Governor's vetoes is to *increase* state spending, those vetoes are per se invalid. Clearly, the net effect of the Governor's vetoes is to allow expenditures greater than those allowed under the Legislature's reduction plan. However, this is not a case, as Senator Rios contends, in which the Governor has *added* to an appropriation in the sense that he has vetoed an item and *replaced it with his own, higher amount.* Rather, the net effect of the Governor's veto is to reinstate the amount *originally appropriated by the Legislature.* Senator Rios argues:

> By striking the legislative reduction, the governor presumably thought he was putting back the original appropriated number. Yet, in adopting HB 2002, the legislature struck the original appropriated number. Thus, for those agencies that are affected by the governor's improper vetoes, there are no legislatively-enacted numbers anywhere for the fiscal year 1991–92 budget.

We do not agree. The line item veto of an amended appropriation renders the amendment void, and the amount appropriated in the original appropriations bill stands. *Callaghan v. Boyce,* 17 Ariz. 433, 458–59, 153 P. 773, 783 (1915). We hold that such line item vetoes are valid when, as here, the effect of the veto is to reinstate previously-appropriated amounts.

## II. The Governor's Reversion Orders

In his veto messages, Governor Symington directed certain state agencies to "impound" specific sums of money and to revert those sums to the general fund at the end of the fiscal year. The Governor's specific reversion orders are as follows:

| | |
|---|---|
| Department of Health Services: | $ 183,500 |
| Arizona Health Care Cost Containment System | |
|     General reversion: | $ 41,700 |
|     Spending authority reduction: | $ 240,600 |
|     Reversion from program budget: | $2,000,000 |
| Department of Corrections: | $ 913,100 |
| Department of Public Safety: | $5,313,500 |
| Department of Revenue: | $ 261,400 |
| Department of Liquor Licenses: | $ 14,100 |
| Department of Racing: | $ 14,200 |

| | |
|---|---|
| Radiation Regulatory Agency: | $ 6,700 |
| Department of Emergency & Military Affairs: | $ 44,100 |
| Department of Economic Security: | $ 70,000 |
| Department of State Parks: | $ 2,200 |

Senator Rios contends that the Governor "has no inherent authority to direct that agencies decline to follow the wishes of the legislature," and that "[t]o allow the governor to substitute his own judgment for that of the legislature's with respect to how money should be spent creates an impermissible intrusion into the legislature's exclusive domain." The Governor responds that he "may order the impoundment of appropriated funds if the appropriation merely gives the Governor permission to spend up to the appropriated amount and does not *require* the expenditure of such amount." (Emphasis in original). We believe the proper balance of power lies between these two extremes.

The constitutionality of the reversion orders presents an issue of first impression in Arizona. We are guided in our analysis by a case from Massachusetts, *Opinion of the Justices to the Senate*, 375 Mass. 827, 376 N.E.2d 1217 (1978). The Massachusetts Supreme Judicial Court stated succinctly the issue that we must now resolve:

The crucial determination to be made is whether, and to what extent, the act of expending appropriated funds, or refusing to spend the full amount of appropriated funds, may be characterized as the exercise of the Governor's constitutional prerogative to execute the laws.

*Id.* at 833, 376 N.E.2d at 1221.

We begin, as we must, with another consideration of the concept of separation of powers contemplated by our Constitution. As previously noted, our Constitution vests the lawmaking power with the Legislature. The Legislature, in the exercise of that lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect. Once the Legislature has acted, however, it becomes the duty of the Executive to "take care that the laws be faithfully executed." Ariz. Const. art. 5, § 4.

We agree that nothing in article 5, section 4 gives the Governor any "power to make legislative decisions." *Litchfield Elementary School No. 79 v. Babbitt*, 125 Ariz. 215, 220, 608 P.2d 792, 797 (App. 1980). However, the execution of the laws is an executive function, and the Governor retains "some discretion to exercise his judgment not to spend money in a wasteful fashion, provided that he has determined reasonably that such a decision will not compromise the achievement of underlying legislative purposes and goals." *Opinion of the Justices*, 375 Mass. at 836, 376 N.E.2d at 1223.

▆ Thus, the Governor must manage the government in a fiscally responsible fashion and is not required, under all circumstances, to dispose of all appropriated money before the end of the fiscal year. If the legislative purpose of the appropriation is carried out and funds remain, the Governor may revert them. Budgets and appropriations bills are, in part, documents of estimation both on the income and expenditure side. Thus, some reversions are common and some are occasionally anticipated. However, we are of the view that our Constitution prohibits the Governor from substituting his judgment for that of the Legislature except through the use of the veto power. In the instances before us, the types of reversions ordered by the Governor represent something more than fiscal management. The effect of the reversions ordered here is to substitute the Governor's judgment for that of the Legislature on matters of appropriation. Therefore, we hold that the Governor's reversion orders were improper.

We turn now to a discussion of the specific directives.

A. *House Bill 2001*

In his veto message on House Bill 2001, Governor Symington ordered two rever-

sions. The first stems from his veto of the Legislature's transfer of $70,000 from the Mental Retardation Capital Investment Fund to the general fund. In place of the transfer ordered by the Legislature, the Governor ordered the Department of Economic Security "to find reductions elsewhere in other programs, preferably from administrative activities." The second reversion order stems from the Governor's veto of the Legislature's transfer of $2,200 from the Land and Water Conservation Surcharge Fund to the general fund. In place of the transfer ordered by the Legislature, the Governor ordered the State Parks Board "to find reductions elsewhere in their General Fund operating budget and to revert a like amount at fiscal year end."

As we stated in Part I of this opinion, the Governor properly may line item veto items of appropriation, including amendments of previously-made appropriations, but he has no power to *alter* an appropriation in the sense that he lines out an item *and replaces it with his own, different amount. Fairfield*, 25 Ariz. at 157, 214 P. at 323. The two reversion orders relating to House Bill 2001 are, in effect, alterations of appropriations. While the Governor properly may revert money that is unnecessary to carry out legislative policy, we do not believe that he may, in advance, order a blanket reversion. To permit such a reversion would allow the Governor, by executive order, to re-allocate funds appropriated by the Legislature. Such a result runs contrary to the separation of powers, and would allow the Governor to encroach impermissibly on the legislative domain. Therefore, we hold that the reversion orders concerning House Bill 2001 are constitutionally impermissible.

### B. *House Bill 2002*

In his veto message on House Bill 2002, Governor Symington ordered 10 reversions from 9 executive agencies. For the reasons that follow, we hold that each of these

directives exceeded the Governor's reversion power.

In his first order, the Governor directed the Department of Health Services to revert $183,500 to the general fund at the end of the fiscal year. This amount represents the difference between the Legislature's proposed $717,200 agency-wide lump sum reduction (vetoed by the Governor) and $533,700, an amount considered necessary by the Governor to fund three specific programs.[4] The Governor stated:

> Having noted my concerns with the agency-wide reduction above, I still believe the Department of Health Services should provide a reduction in this mid-year "belt-tightening" exercise. Therefore, I have instructed the Department to revert to the general fund an amount of ($183,000).

This order does not fall within the Governor's narrow reversion power. The Governor has not targeted specific monies within the Department's budget that will remain unspent at the end of the fiscal year. Instead, the Governor has attempted to substitute his own spending priorities for the Legislature's by vetoing a legislative reduction, impounding a lesser amount, and then directing that the balance be spent on programs the Governor considers necessary. Because this attempted re-allocation does not fall within the narrow limits of the Governor's reversion power, this directive runs counter to the Constitution.

In his second order, Governor Symington directed the Arizona Health Care Cost Containment System Administration Division to revert $41,700 to the general fund at the end of the fiscal year. This amount represents the difference between the Legislature's proposed $391,700 Administration Division lump sum reduction (vetoed by the governor) and $350,000, an amount considered necessary by the Governor to fund professional services and to research cost containment strategies for fiscal year 1993. The Governor stated:

---

**4.** These programs are: (1) the Governor's Corrective Action Plan for Children's Rehabilitative Services; (2) design of improvements at the Arizona State Hospital; and (3) the Business

and Contract Management Systems for the management of Title XIX (Mental Health) Programs.

A portion of the ($391,000) reduction cannot be accomplished due to the demonstrated and possible need to expend $350,000 worth of professional services to bring additional federal funds into the state and to research cost containment strategies for FY 1993. This year AHCCCS has had to complete and pay for services which were not originally contemplated in the FY 1992 budget.... The benefit of funding these services can far exceed the additional cost involved. Therefore, I have instructed the agency to revert ($41,700) to the General Fund....

This reversion order fails for the same reasons stated with regard to the Department of Health Services' reversion. The Governor may not substitute his judgment for that of the Legislature by reallocating funds.

■ In his third order, Governor Symington directed AHCCCS to revert "no less than ($2,000,000) of General Fund acute care funding which was received as a supplemental appropriation. [The total amount of this supplemental appropriation, approved by the Governor, was $31,313,-800.] *This reversion directive is the result of further study by my staff and the agency which was done independent of the Legislature's recommendation."* (Emphasis added). The explicit language of the Governor's veto message makes clear that this reversion directive is an attempt by the Governor to substitute his judgment for that of the Legislature. The Governor has no power to alter an appropriation through the use of an impoundment simply because he disagrees with the Legislature's estimates as to the amount of money needed to fund acute care programs. Therefore, this directive is void.

In his fourth order, the Governor directed the Department of Corrections to revert $913,100 to the general fund at the end of the fiscal year. The Governor stated:

I laid out a prison plan in the *FY 1993 Executive Budget* and I hoped the Legislature would have passed the appropria-

tion's format in this bill which would have allowed me to implement the plan. However, this was not the case. The legislative proposals force upon the Department of Corrections a reduction of ($1,527,800) in General Fund appropriations authority, including an unwise reallocation of $509,500 from the Department's Endowment Funds. This reduction and re-allocation would prevent the Department from safely managing a severely overcrowded prison system by opening the new Safford prison in May, preparing to double-bunk the Safford facility in July, and completing necessary repairs to an aging institutional infrastructure.

Pending legislative action to deal with the prison situation, I have instructed the Department to revert to the General Fund at fiscal year end an amount of ($913,100).

■ This reversion order is void for the same reasons stated with regard to the Department of Health Services' reversion. Clearly, the Governor disagrees with the Legislature's reductions in the Department of Correction's appropriation. His only remedy in this situation, however, is to exercise his line item veto power over the reductions themselves. He may not constitutionally alter the amount of the reduction by ordering the reversion of a lesser amount.

In his fifth order, the Governor directed the Department of Public Safety to revert a minimum of $5,513,500 to the general fund. This amount represents the difference between $6,684,500, the Legislature's proposed reduction to the Department's general fund appropriation (vetoed by the Governor) and $1,371,000, the sum of: (1) $734,200, a new appropriation to the Department from the DPS RICO account (vetoed by the Governor)[5] that the Governor wanted to be funded from the general fund; and (2) $636,800, a new appropriation to the Department from the Drug and Gang Enforcement Account of the Criminal Justice Enhancement Fund (vetoed by the

---

5. This amount would have been transferred to the DPS RICO account from the county RICO accounts but for the Governor's veto (now invalid) of that transfer in House Bill 2001.

Governor) that the Governor also wanted to be funded from the general fund. The Governor stated:

I lined-out the General Fund authority reduction of ($6,684,500) to allow the Department to use approximately $534,200 of General Fund authority in the Department's lump sum budget which will not be coming into the state due to my line-item veto of Section 7 of H.B. 2001 (40th Legislature, 7th Special Session), Fund Transfers, which would have appropriated County RICO accounts to the state treasury.

I lined-out the $636,800 appropriation from the Drug and Gang Enforcement Account of the Criminal Justice Enhancement Fund to the Department. The Drug and Gang Enforcement Account supports drug education, apprehension, prosecution, detention, and forensic programs within numerous counties and cities statewide. In FY 1989, the state appropriated $2,500,000 from the General Fund to support the Drug Enforcement Account programs. In FY 1992, there was no General Fund support and now the Legislature has passed this bill further reducing funding for these important programs. The War on Drugs and gang mitigation are vital fights to which I am deeply committed. This action reinforces my priorities to assist on the front-line of those efforts.

Since the Department's appropriation falls back to the original language of Laws 1991, chapter 287, I will direct the Department to revert from the General Fund a minimum of ($5,513,500).

This reversion order is also constitutionally deficient for the same reasons stated with regard to the Department of Health Services' reversion. The Governor's desire to assist in the fight against drugs and gangs does not permit him to restructure the Legislature's allocation of appropriated monies.

The Governor's sixth through tenth orders consist of advance blanket reversion instructions directed toward the following 5 agencies: Department of Revenue ($261,-400); Department of Liquor Licenses ($14,-

100); Department of Racing ($14,200); Radiation Regulatory Agency ($6,700); and Department of Emergency and Military Affairs ($44,100). We need at this point only briefly restate our prior holding. The Governor's impoundment power is a limited power. Advance blanket reversion orders cannot be used to restructure the spending priorities set by the Legislature.

### DISPOSITION

The Governor's line item vetoes of portions of House Bill 2001 and House Bill 2002 are valid. Therefore, the relief requested with respect to those items is denied. The Governor's attempted line item veto of the RICO fund transfers and his reversion directives are invalid and of no force and effect. Therefore, the relief requested is granted as to those items.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.