**WISCONSIN WINNEBAGO NATION, Plaintiff–Appellant,**

v.

**Tommy G. THOMPSON, Governor of the State of Wisconsin, Defendant–Appellee.**

No. 93–2605.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1993.

Decided April 22, 1994.

---

Donald J. Simon (argued), Reid P. Chambers, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for Wisconsin Winnebago Nation.

Warren D. Weinstein, Asst. Atty. Gen. (argued), Laura Sutherland, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for Tommy G. Thompson.

Before CUMMINGS, FRIEDMAN * and CUDAHY, Circuit Judges.

CUMMINGS, Circuit Judge.

The Wisconsin Winnebago Nation ("Winnebago Nation") appeals from a grant of summary judgment in favor of the defendant Tommy Thompson, Governor of the State of Wisconsin, in an action governed by the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* The Winnebago Nation is a federally recognized Indian tribe, organized under a constitution approved by the Secretary of the Interior pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476. Defendant Governor Thompson is responsible, under

* The Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit is sitting by designation.

Wisconsin law, for negotiations with the plaintiff conducted pursuant to 25 U.S.C. § 2710.

### The Statute

The Indian Gaming Regulatory Act ("IGRA") provides a comprehensive scheme for regulating gaming activities on Indian land. IGRA divides gaming into three classes, each subject to differing degrees of tribal, state, and federal jurisdiction and regulation. See generally *Mashantucket Pequot Tribe v. State of Connecticut,* 913 F.2d 1024, 1026 (2nd Cir.1990). Class I gaming includes social games for nominal prizes and traditional Indian gaming conducted at celebrations and ceremonies (25 U.S.C. § 2703(6)). When conducted on Indian lands, this class of gaming is subject only to tribal regulation (25 U.S.C. § 2710(a)(1)). Class II gaming consists of bingo and related games, such as lotto and pull-tabs, and card games, such as poker, in which players play against each other rather than against the house (25 U.S.C. §§ 2703(7)(A), (B)). Class II gaming does not, however, include electronic games of chance, slot machines, or "any banking card game," such as blackjack or baccarat, in which players play against the house and the house acts as banker, see 25 U.S.C. § 2703(7)(B); S.Rep. No. 446, 100th Cong., 2d Sess. 9, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3071, 3079.[1] Although Class II gaming may be conducted only on Indian lands located in states that permit such gaming for any purpose (25 U.S.C. § 2710(b)(1)(A)), such gaming is subject only to tribal regulation and federal oversight by the National Indian Gaming Commission (25 U.S.C. §§ 2710(a), (b), (c)).[2] Class III gaming includes all forms of gaming that are not Class I or Class II.

Class III gaming activities may be conducted on Indian lands only if (1) authorized by a tribal ordinance or resolution; (2) located in a state that permits such gaming for any purpose by any person, organization or entity; and (3) conducted in conformance with a compact entered into by the tribe and the state in which the tribe's land is located (25 U.S.C. §§ 2710(d)(1)(A)–(C)). Concerned that states would have little incentive to negotiate such compacts (S.Rep. No. 446, 100th Cong., 2d Sess. 13, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3071, 3083), Congress provided a framework for the negotiation and conclusion of such compacts. First, IGRA requires that a tribe request the state in which its lands are situated to enter into a compact (25 U.S.C. § 2710(d)(3)(A)). Upon receipt of such a request, the state must enter into good faith negotiations with the tribe (25 U.S.C. § 2710(d)(3)(A)). If after 180 days, however, the state has refused to enter into negotiations or has failed to negotiate in good faith, the tribe may initiate an action in an appropriate United States District Court (25 U.S.C. §§ 2710(d)(7)(A)(i), (7)(B)(i)). If the district court finds that the state has failed to negotiate in good faith, it must order the state and tribe to conclude a compact within a 60–day period (25 U.S.C. § 2710(d)(7)(B)(iii)). If after this period the parties fail to conclude a compact, the court may appoint a mediator to select a compact; the compact becomes effective upon the state's consent (25 U.S.C. §§ 2710(d)(7)(B)(iv)–(vi)). If the state refuses to consent to the compact, the Secretary of the Interior is authorized to prescribe procedures under which Class III gaming may be conducted on the tribe's land (25 U.S.C. § 2710(d)(7)(B)(vii)).

### Background

Although the Winnebago once exercised sovereignty over most of what is now Wisconsin, their tribal land presently consists of 688 acres scattered throughout the state. The Winnebago Nation's tribal lands include parcels in Clark, Jackson, Juneau, Monroe, Sauk, Shawano, Wood and Dane Counties. Although the Winnebago Nation's land is divided among various parcels in various

---

**1.** Certain banking card games operated by Indian tribes in some states on or before May 1, 1988 may be grandfathered in as Class II gaming. 25 U.S.C. § 2703(7)(C).

**2.** In some circumstances, however, tribal regulation of Class II gaming must be at least as restrictive as state law (25 U.S.C. § 2710(b)(4)(A)), while in other instances tribal regulations must conform with state law (25 U.S.C. § 2703(7)(A)(ii)).

counties—rather than, as is more often the case, consolidated in a single bloc—the land is all considered by the Secretary of the Interior to be part of the Winnebago reservation and, more importantly for present purposes, is all "Indian lands" within the meaning of the Indian Gaming Regulatory Act (25 U.S.C. § 2703(4)).

At the heart of this controversy is the portion of the Winnebago Nation's tribal land located in Dane County on the outskirts of Madison. The site was purchased by the tribe in 1982 and, although now zoned for commercial purposes, it has a "special historical and cultural significance to the Winnebago people." (Br. 7). Situated on the outskirts of Wisconsin's capital and second largest city and near the intersection of well travelled roadways (Interstate 90 and Highway 12), the parcel is also an ideal location for a casino—a fact not lost on the Winnebago Nation. See Winnebago Nation's Brief at 13 ("Because of its proximity to a population center and to a highway system, th[e] site is the Tribe's most favorable location for a gaming business.").

The Winnebago Nation has operated gaming on its land since the early 1980s, initially offering only bingo but soon adding video gaming at facilities in Sauk, Jackson and Wood Counties. The Winnebago's gaming operations in the 1980s and early 1990s were extremely successful—one year generating over $10 million in revenue. This income was put to good use, providing needed social services, including housing for the elderly and disabled, clothing for needy children, and health care.

This income stream dried up, however, in April 1992 when the National Indian Gaming Commission promulgated regulations that made clear that video gaming such as that conducted at the Winnebago Nation's facilities in Sauk, Jackson and Wood Counties was a Class III activity and thus could only be conducted once a Tribal–State compact was

in place. Since the Winnebago Nation had not entered into a compact with the State of Wisconsin, it was forced to suspend video gaming at its three facilities. As a result the facilities were forced to close and over 300 Winnebago employees were laid off.

Although the Winnebago Nation and the State of Wisconsin had not concluded a compact prior to the promulgation of the federal video gaming regulation, negotiations for such a compact had already begun, but were stalled on a single issue—whether the Winnebago Nation would be allowed to conduct Class III gaming at its Dane County site. By June 1992, however, the State of Wisconsin and the Winnebago Nation had agreed to a Tribal–State compact, setting out the terms and conditions under which the Winnebago Nation could conduct Class III gaming on "the Tribe's lands in the State of Wisconsin ..." (App. 97). "Tribe's lands" was defined on the compact's third page as including "[a]ll lands within the State of Wisconsin held in trust by the United States ... over which the Tribe exercised governmental power as of October 17, 1988" and other lands not relevant here (App. 98). The compact set out the "terms and conditions under which certain Class III gaming [could] be conducted on the Tribe's lands" (App. 97) and provided that the Winnebago Nation could operate Class III gaming on "[t]ribal Land in Sauk, Jackson, and Wood Counties" (App. 135), the counties in which it had previously conducted gaming. The compact did not authorize Class III gaming on any other of the "Tribe's lands."

Within a month after agreeing to the compact,[3] the Winnebago Nation notified Governor Thompson and the Wisconsin Gaming Commission that it wished to conduct Class III gaming on its tribal land in Dane County. The State of Wisconsin, however, refused to negotiate the terms and conditions for gaming at that site.

---

**3.** The record does not reveal when after agreeing to the compact the Winnebago Nation first requested negotiations regarding the Dane County location. It may have been as early as June 1992 (Complaint at 9). It could not, however, have been later than mid-July 1992 since if it had the district court would have lacked jurisdiction over the complaint the Nation filed in January 1993. See 25 U.S.C. § 2710(d)(7)(B)(i) (tribe may initiate cause of action to force negotiation of compact only "after the close of the 180–day period beginning on the date on which the Indian tribe requested the State to enter into negotiations....").

In January 1993 the Winnebago Nation brought suit in United States District Court for the Western District of Wisconsin, requesting that the district court order the State of Wisconsin to conclude a Tribal–State compact governing the terms and conditions of Class III gaming at the Dane County site. In its first claim, the Winnebago Nation asserted (1) that IGRA gives Indian tribes, as sovereign governments, the unilateral right to determine where on tribal lands Class III gaming will be conducted, and (2) that since the Winnebago Nation wished to conduct Class III gaming on its lands in Dane County, the state was required by IGRA to enter into negotiations with the Winnebago Nation over the terms and conditions of such gaming at that location. In its second claim, the Winnebago Nation argued that even if the Winnebago Nation did not have a unilateral right to determine location, Wisconsin's refusal to negotiate regarding whether Class III gaming would be conducted in Dane County constituted a failure to negotiate in good faith as required by IGRA.

The Winnebago Nation moved for summary judgment on the first count and the State of Wisconsin cross-moved for summary judgment on both counts. The district court granted the State's cross-motion and dismissed the Winnebago Nation's complaint. 824 F.Supp. 167. The district court held that (1) the location of a tribal gaming facility was a proper subject for negotiation between the State and the Winnebago Nation and that (2) the Winnebago Nation was bound by the terms of the Tribal–State compact entered with the state and this "final agreement" did not allow gaming to be conducted on the tribe's land in Dane County.

■ This appeal ensued. A grant of summary judgment is reviewed *de novo, Russo v. Health, Welfare & Pension Fund*, 984 F.2d 762, 765 (7th Cir.1993), to be affirmed if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, *Edwards v. Massachusetts Mutual Life Ins. Co.*, 936 F.2d 289, 291 (7th Cir.1991), after viewing the record in the light most favorable to the non-moving party, *Russo*, 984 F.2d at 765. Since summary judgment is appropriate in this case, we affirm.

## Analysis

■ Although the parties put great energy into other arguments, the central issue in this case is whether the compact the State of Wisconsin and the Winnebago Nation entered into in June 1992 includes within its scope the tribe's land in Dane County. The Winnebago Nation and the State of Wisconsin are bound by the terms of the compact concluded between them. See 25 U.S.C. § 2710(d)(1)(C) (Class III gaming may be conducted only "in conformance with a Tribal–State compact"); *id.* at § 2710(d)(7)(A)(ii) (permitting tribe or state to bring action to enjoin any Class III activity conducted in violation of Tribal–State compact). Thus if that compact resolves the question of whether Class III gaming may be conducted on the Winnebago Nation's land in Dane county, the tribe is bound by that agreement—regardless of how this Court might resolve the parties' other arguments.

Here the State of Wisconsin and the Winnebago Nation entered into a compact "authoriz[ing] the operation of certain Class III gaming by the Tribe on the Tribe's lands" (App. 97), and agreed that such gaming would be allowed in Sauk, Jackson and Wood Counties (App. 135). The Winnebago Nation argues this compact was not intended to govern the conduct of gaming on its tribal land in Dane County. The Winnebago Nation alleges instead that it agreed merely to a "limited compact that would: (1) allow it to reopen its existing facilities in Sauk, Jackson, and Wood Counties; and (2) postpone the controversy over the [Dane County] site for subsequent negotiations" (Br. 14). The plain language of the compact, however, does not support this position. The compact unquestionably governs the conduct of Class III gaming not merely on the tribe's land in Sauk, Jackson and Wood Counties, but also on other lands controlled by the Winnebago Nation: the compact authorizes certain Class III gaming on—without limitation—"the Tribe's lands" (Declaration of Policies and

Purposes, App. 97),[4] a term defined to include "[a]ll lands within the State of Wisconsin held in trust by the United States for the benefit of the Wisconsin Winnebago Tribe ... and over which the Tribe exercised governmental power as of October 17, 1988" (App. 98). The compact thus controls gaming not only at the locations specifically named, but also at other locations including the Dane County site, which is held in trust for the Winnebago Nation by the United States and has been part of the Winnebago Nation reservation since 1987 (Br. 7). And while the compact permits gaming at the three specified locations, by negative implication it prohibits gaming elsewhere on the "Tribe's lands." Thus since Dane County is not one of the locations at which the Winnebago Nation and the State of Wisconsin agreed gaming may be conducted, no gaming may take place on the Winnebago Nation's lands in that county without violating the compact.[5]

 The Winnebago Nation nevertheless suggests that it is entitled to conduct gaming at the Dane County site. The Winnebago Nation argues that IGRA gives the tribe the "unilateral right [ (1) ] to determine[ ] where on its tribal trust land" it will conduct Class III gaming and (2) to force the state to negotiate the terms under which gaming will be conducted at the chosen site (Complaint at 10). But even if IGRA gives a tribe the right to dictate the location of gaming facilities on its land, the tribe may not exercise that right immediately after it concludes a compact purporting to settle the terms and conditions under which Class III gaming will be conducted on that tribe's land. To hold otherwise would undermine the process of negotiation and vitiate the various agreements and compromises which allowed

a compact to be concluded. Section 2710(d)(7) is meant to give Indian tribes a mechanism through which to force a reluctant state government to the bargaining table and require it to negotiate a compact in good faith: it is not intended to be a means by which a tribe may make an end-run around an existing agreement.

This is not to say, however, that at some later date, circumstances having changed, the Winnebago Nation may not require the State of Wisconsin to negotiate a new compact or to enter into discussions to amend this compact, but rather that the Winnebago Nation may not at this time seek to obtain in court what it recently bargained away in the compact. This Court, however, need not now determine exactly under what conditions a tribe could require a state to renegotiate a term of a concluded compact since it is clear that whatever those conditions might be, they were not satisfied here.

 Thus the Winnebago Nation's argument to the contrary in its first cause of action notwithstanding, the State of Wisconsin is not required at this time to enter negotiations regarding the conduct of Class III gaming at the Dane County site. The question of whether Class III gaming would be conducted in Dane County was settled by the compact entered into six months before this suit was begun. Nor, as the Winnebago Nation asserts in its second cause of action, has the State of Wisconsin failed to act in good faith by refusing to enter into negotiations regarding the Dane County site. The State of Wisconsin's refusal to revisit a subject of a recently concluded compact cannot, as a matter of law, be considered an act of bad faith.[6]

---

4. The compact also states that "the Wisconsin Winnebago [Nation] and the State of Wisconsin have mutually agreed to the terms and conditions under which certain Class III gaming may be conducted on the Tribe's lands" (Preamble, App. 97).

5. The Winnebago Nation makes much of the fact that the compact specifically provides that a fourth location may be added, if the state and tribe agree, in one of the three enumerated counties. This is a red herring. The fact is that while the compact raises the possibility of an addition-

al location in Sauk, Jackson, or Wood Counties, nothing in the compact prevents it from being amended to include a location elsewhere on the "Tribe's lands."

6. In addition to the claim that the State of Wisconsin has acted in bad faith by refusing at this time to enter negotiations over the Dane County site, the Winnebago Nation makes the claim that the State of Wisconsin failed to negotiate the original compact in good faith. The Winnebago Nation thus puts forth evidence tending to show that Wisconsin never intended to allow Class III

*Conclusion*

For the foregoing reasons, the judgment of the district court is AFFIRMED.

gaming at the Dane County site. The claim that the State of Wisconsin did not negotiate the terms of the June 1992 compact in good faith should, however, have been brought prior to the completion of that compact. A district court does not have jurisdiction over a claim alleging that a party to a completed compact acted in bad faith while negotiating that agreement. See 25 U.S.C. § 2710(d)(7)(A)(i) (giving district court jurisdiction only over claim that a state is failing to conduct ongoing negotiations in good faith).