945 P.2d 818

**SALT RIVER PIMA–MARICOPA INDIAN COMMUNITY, an Indian tribe organized under the Indian Reorganization Act of 1934, Petitioner,**

v.

**Jane Dee HULL, Governor of Arizona, Respondent.**

No. CV–97–0090–SA.

Supreme Court of Arizona, En Banc.

Oct. 7, 1997.

Shea & Wilks by Philip J. Shea, Richard B. Wilks, William W. Quinn and Osborn Maledon, P.A. by Andrew D. Hurwitz, Thomas L. Hudson, Phoenix, for Salt River Pima–Maricopa Indian Community.

Walker Ellsworth, P.L.C. by Ian A. Macpherson and Office of the Governor by Lisa T. Hauser, Phoenix, for Governor Jane Dee Hull.

Grant Woods, Arizona Attorney General by Rebecca White Berch, Thomas J. Dennis, Phoenix, for the State of Arizona.

## OPINION

FELDMAN, Justice.

In a special action, the Salt River Pima–Maricopa Indian Community (the Tribe) requested relief—what was formerly called a writ of mandamus—requiring Governor J. Fife Symington to sign a "standard gaming compact" upon the request of the Tribe as required by Proposition 201, adopted by initiative in the 1996 election and codified as A.R.S. § 5–601.01. Governor Symington had refused to sign such a compact. We have

jurisdiction under article VI, § 5(4) of the Arizona Constitution and Rules 1(a), 2(a)(1), and 7(b), Ariz.R.P.Spec.Act.

After the case was briefed, argued, and submitted in this court, Governor Symington resigned from office. His successor, Jane Dee Hull, was therefore "automatically substituted as a party," as required by Rule 27(c)(1), Ariz.R.Civ.App.P. Other than that substitution and the consequent change in the case caption, Governor Hull has not participated in any way. Unless used generically, therefore, the phrase "the Governor" in this opinion refers to Governor Symington, not Governor Hull.

## FACTS AND PROCEDURAL HISTORY

Congress passed the Indian Gaming Regulatory Act (IGRA) in 1988. In 1992, the Arizona Legislature enacted A.R.S. § 5–601 to permit the state to enter into gaming compacts with Arizona tribes. From July 1992 to 1996, the state, through Governor Symington, made such compacts with sixteen Arizona tribes. However, after the opinions in *Rumsey Indian Rancheria of Wintun Indians v. Wilson*[1] and *Seminole Tribe of Florida v. Florida*,[2] the Governor refused to make any new compacts. He specifically refused to conclude negotiations and enter into a compact tendered by the Tribe.

When the Governor declined to make any new compacts, the Tribe and others chose to circulate initiative petitions; they obtained the necessary signatures to put the initiative on the ballot and campaigned vigorously for its adoption. Almost two-thirds of those who voted in the 1996 general election favored the initiative. The Governor did not attempt a veto under article IV, part 1, § 1(6) of the Arizona Constitution but proclaimed the initiative, codified as A.R.S. § 5–601.01, to be law on December 6, 1996.

The text of Proposition 201 contained a clear declaration of intent and purpose:

Pursuant to section 5–601, Arizona Revised Statutes, the state has entered into gaming compacts with sixteen of Arizona's twenty-one Indian tribes. These compacts are of a standard form that was negotiated by the state with various Indian tribes and approved by the United States Secretary of the Interior. The standard form of compact serves the interests of the state by providing uniform comprehensive controls over reservation gaming including regulation of Indian gaming contractors and vendors and limitation upon types of gaming, the number of gaming devices and the number of gaming locations on each reservation. The state refuses to enter into the standard form of compact with any of the five Arizona tribes that do not have a compact. In the interests of fairness and sound administration the same standard compact should be available to any of those five tribes who request it.

On December 9, 1996, the Tribe's president submitted a standard form of gaming compact to the Governor for review and signature. In response, the Governor indicated negotiation was required on some aspects of the compact. Shortly thereafter, two residents of Scottsdale, which borders the Tribe's reservation, filed in this court a petition for special action challenging the constitutionality of A.R.S. § 5–601.01. We granted a stay to toll the statute's thirty-day period for signing the compact. After hearing oral argument on the petition, we declined to accept jurisdiction and dissolved the stay. *See Sears v. Symington*, No. CV–96–0650–SA (Ariz. Sup.Ct. Feb. 12, 1997 order).

The next day the Governor signed and tendered to the Tribe a compact containing several significant changes from the standard form of compact submitted by the Tribe and mandated by the statute. Of particular concern was the addition of a non-standard clause to the section concerning casino location: all "gaming facility locations shall be

---

**1.** 41 F.3d 421 (9th Cir.1994) (holding the state need not negotiate with tribe that planned to conduct gaming of a type state law forbids in state territory), amended and superseded, reh'g denied, en banc reh'g denied, 64 F.3d 1250 (1995), amended, reh'g denied, 99 F.3d 321 (1996), cert. denied sub nom. *Sycuan Band of*

*Mission Indians v. Wilson*, —— U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997).

**2.** 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding tribes cannot sue states that refuse to comply with IGRA in federal court).

approved by the Arizona Department of Gaming." With this amended compact, the Governor sent a letter stating he was prepared to continue negotiations with the Tribe. The Governor and the Tribe both read the added clause as a provision giving the state's executive branch control over the location of casinos on tribal land. Because the clause was not satisfactory to the Tribe, it filed this special action.

## DISCUSSION

The Tribe argues that the Governor violated his constitutional duty to execute the state's laws when he failed to sign the standard form of gaming compact submitted by the Tribe under A.R.S. § 5–601.01. The Governor responds that under the United States and Arizona Constitutions the statute is preempted by IGRA, which requires negotiation. The Governor also argues the statute's requirement that he sign the standard compact violates article III of the Arizona Constitution because it invades and usurps the executive powers of the governor to negotiate compacts under IGRA. Additionally, the Governor requests the court to consider whether the statute is special legislation that violates article IV, part 4, § 19 of the Arizona Constitution, whether a standard form of compact exists, and how the statute should be construed.

## A. The Indian Gaming Regulatory Act, A.R.S. § 5–601, and Proposition 201

In enacting the Indian Gaming Regulatory Act, Congress could have prohibited or allowed tribes to conduct any type of gaming in Indian country but instead chose to balance the interests of tribes and their neighbors. IGRA permits states and tribes, with the approval of the Secretary of the Interior, to make compacts that permit and govern gaming on Indian lands, and permits tribes that wish such compacts to request the state in which the tribe plans to locate a casino to begin negotiations for such a compact. When a tribe makes such a request, IGRA requires that "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).

A.R.S. § 5–601, under which the Tribe first tendered its compact, reads in pertinent part:

## § 5–601 Gambling on Indian reservations; tribal-state compacts

A. Notwithstanding any other law, this state, through the governor, may enter into negotiations and execute tribal-state compacts with Indian tribes in this state pursuant to the Indian gaming regulatory act of 1988 (25 United States Code §§ 2701 through 2721 and 18 United States Code §§ 1166 through 1168). Notwithstanding the authority granted to the governor by this subsection, this state specifically reserves all of its rights, as attributes of its inherent sovereignty, recognized by the tenth and eleventh amendments to the United States Constitution. The governor shall not execute a tribal-state compact which waives, abrogates or diminishes these rights.

A.R.S. § 5–601.01, enacted by passage of the initiative, provides:

## § 5–601.01. Standard form of tribal-state compact; eligible tribes; limitation on time for execution of compact

A. Notwithstanding any other law or the provisions of § 5–601, the state, through the governor, shall enter into the state's standard form of gaming compact with any eligible Indian tribe that requests it.

B. For purposes of this section:

1. The state's standard form of gaming compact is the form of compact that contains provisions limiting types of gaming, the number of gaming devices, the number of gaming locations, and other provisions, that are common to the compacts entered into by this state with Indian tribes in this state on June 24, 1993, and approved by the United States secretary of the interior on July 30, 1993.

2. An eligible Indian tribe is an Indian tribe in this state that has not entered into a gaming compact with the state.

C. The state, through the governor, shall execute the compact required by this section within thirty days after written

request by the governing body of an eligible tribe.

The practical result of § 5–601.01 is that if negotiations are requested by one of the five tribes without a compact and fail to go forward to completion, the tribe may request the standard compact, which *shall* be executed by the governor.

We note that the statute did no more than put eligible tribes on an equal footing with the tribes that already had compacts when *Rumsey* was decided. It could simply have removed the state's *Rumsey* objection to class III gaming and required the state to negotiate with each tribe individually. This would have prevented the state from taking the position that there would be no class III gaming but would have allowed the state to negotiate casino location in a more flexible way to accommodate the different circumstances presented by each reservation's location. The events leading up to the initiative's passage suggest that its purpose was to remove the *Rumsey* obstacle to further compacting. But the initiative does more: it not only removes the *Rumsey* objection but also requires the state to enter into the same compact entered into with other tribes. Thus the flexibility to negotiate location was not preserved. We must enforce the plain terms of the statute unless it violates constitutional principle or leads to absurd or irrational results. That is not the case here.

**B. Section 5–601.01 is not preempted by IGRA**

**1. The governor's negotiation power**

The statute, the Governor argues, usurps IGRA's grant of executive power to negotiate compacts. The essence of the Governor's argument is that IGRA requires negotiation with Indian tribes on a case-by-case basis for the terms of gaming compacts covering reservation land. We agree, but note IGRA confers no powers or privileges on the governor as such. The federal statute requires only that "the *State* shall negotiate" and permits any "*State* and any Indian tribe" to enter into a "Tribal-*State* compact governing gaming...." 25 U.S.C. § 2710(d)(3)(A) and (B) (emphasis added). As chief executive the governor is the state's agent, whose duty is to "take care that the laws be faithfully executed." *Rios v. Symington,* 172 Ariz. 3, 12, 833 P.2d 20, 29 (1992) (quoting Ariz. Const. art. V, § 4). That duty, of course, includes proposals that become law through the initiative procedure.

The Governor argues IGRA requires negotiations and § 5–601.01 prohibits him from negotiating. We do not agree. By § 5–601 the Legislature gave the governor the power to negotiate gaming compacts under IGRA, subject to the state's rights under the Tenth and Eleventh Amendments to the United States Constitution. The new statute mentions but does not repeal § 5–601 and does not revoke the Legislature's grant of power to negotiate. A governor's negotiation power under § 5–601 remains. But § 5–601.01 says that notwithstanding § 5–601 and other statutes, if negotiations fail, and if the standard form of compact is requested by a tribe, it must be accepted within thirty days. Until then, a governor is free to negotiate with the tribe about any compact term. He or she may use the power of persuasion and the considerable authority of the governor's office to persuade a tribe to accept something different from the standard compact. He or she may bargain by giving some advantage in one clause for some consideration in another. But as a matter of state law, the statute adopted by the people requires that if a governor is unable to persuade, bargain, cajole, or otherwise reach an agreement, the governor is to give that tribe the same "deal" Governor Symington gave the other tribes when he operated under the Legislature's broad delegation of authority in § 5–601. That form of compact limits the type of gaming, the number of gaming devices, and the number of gaming locations. It does not restrict the tribes' authority over site decisions. *See* Proposition 201, Statement of Intent.

We conclude this does not violate or conflict with IGRA. We do not believe that statute prevents, or could prevent, the people of this state from deciding on the minimum terms of the agreement or giving their governor a minimum bargaining position. One could argue, of course, that by setting forth

the state's minimum terms for compacting, the initiative gives the tribes a negotiating advantage—a peek, so to speak, at the state's "hole card." If so, one might assume that in passing the initiative the people, driven by notions of fair play, decided it was only right to level the playing field after *Rumsey* by giving the tribes that had no compacts what the other tribes had been able to accomplish before *Rumsey*. As the text of the initiative states: "In the interests of fairness ... the ... standard compact should be available to any of [the] five tribes who request it."

## 2. The state's obligation to negotiate under IGRA

■ We see nothing in IGRA that prevents the people of Arizona from adopting a policy that when and if a governor's negotiations fail, the state should, if requested, give the five Indian tribes that have no compact an agreement exactly like those the Governor gave the first compacting tribes. It is possible, of course, that the people may have made the wrong policy decision. If so, it is not our job to choose a different policy but only to recognize and apply the law the people passed.

The text of that law is absolutely clear. Leaving in effect § 5–601, which instructs and empowers the governor to negotiate, § 5–601.01 instructs the governor to give a non-compacting tribe the standard agreement adopted in previous negotiations. We do not believe the requirement that the five non-compacting tribes be given at least the same agreement given other tribes offends the text or spirit of IGRA and is thus impliedly preempted. Quite the opposite is true. IGRA requires only that the *state* negotiate in good faith with the tribe to enter into a compact. The initiative measure satisfies that requirement by offering the tribes without compacts the same agreement given all other tribes, plus or minus anything agreed upon in negotiations. We do not believe this procedure offends the requirement that the state enter into good faith negotiations.

■ The Governor, we believe, fails to consider the fact that states have no right of control over the use of Indian lands. Absent IGRA, tribes were free to use their land for any purpose not prohibited by federal law and permitted by tribal law. IGRA, in fact, requires a tribe to *relinquish* tribal sovereignty by requiring it to negotiate and compact with the state and thus agree to something less than complete freedom in the use of its land with respect to gaming activities. *See* 134 Cong. Rec. S12,649. Proposition 201 gave the five tribes more freedom of land use than the Governor thought proper. But in our judgment, had the people of this state desired to instruct the Governor to go even further—to put no restrictions on gaming on Indian lands, for instance—they could have done so without violating IGRA.

■ Section 2710(d)(7) of IGRA "is meant to give Indian tribes a mechanism through which to force a reluctant state government to the bargaining table and require it to negotiate a compact in good faith...." *Wisconsin Winnebago Nation v. Thompson,* 22 F.3d 719, 724 (7th Cir.1994). Nothing in IGRA prevents a state from deciding that the state-tribal compact may permit the tribe to select casino location. The district judge in *Winnebago* found that location is a legitimate subject of negotiation. *Wisconsin Winnebago Nation v. Thompson,* 824 F.Supp. 167, 171 (W.D.Wis.1993), *aff'd,* 22 F.3d 719. The judge held only that a tribe cannot impose its right of site selection on an unwilling state government. He did *not* hold—nor could he, we believe—that the state could not agree to allow a tribe to select location.[3]

■ It is true that the Governor was not willing to let the Tribe choose location. But "governor" is not a synonym for "state." Absent a constitutional provision, a governor has no authority to decide the terms of a compact other than the power given by the Legislature or the people. Federal law does

---

**3.** The concurrence cautions us about *Rumsey,* in which the Ninth Circuit held that when a state generally prohibits gaming activities sought by a tribe, the state has no duty under IGRA to negotiate with respect to such gaming on tribal land.

This is a question, as the concurrence acknowledges, not presented and not decided. Thus, we believe it is premature to suggest that the compact provisions regarding class III gaming are not viable. That question is not before us.

not confer on a governor any greater power than that given by the state constitution. As explained in the next section, under the Arizona Constitution legislation adopted by initiative limits the governor's powers. We therefore find no federal preemption.

## C. The statute does not usurp the governor's executive powers

■ The Governor argues A.R.S. § 5–601.01 violates article III of our constitution because it displaces and usurps his authority to decide the terms of a new compact. We disagree. In Arizona, unlike the federal system, the Legislature has all power not expressly denied it or granted to another branch of government. *Turner v. Superior Court*, 3 Ariz.App. 414, 415 P.2d 129 (1966) (citing authorities). Under the initiative provisions of the constitution the ultimate power to legislate is reserved to the people and is at least as great as the power of the Legislature. *See* Ariz. Const. art. IV, part 1, § 1(2); *Queen Creek Land & Cattle Corp. v. Yavapai County Board of Supervisors*, 108 Ariz. 449, 501 P.2d 391 (1972); *Iman v. Bolin*, 98 Ariz. 358, 404 P.2d 705 (1965). The governor has the duty under article V, § 4 to "take care that the laws be faithfully executed." Under article IV, what is passed by initiative is legislation and law that the governor must execute in good faith.

■ The contrast between the state and federal systems is clear. Congress has only the powers granted to it by article 1, § 8 of the United States Constitution. The President is given, by article 2, § 2, power to make treaties with the advice and consent of the Senate. The Arizona Constitution, on the other hand, gives the governor no power to make treaties or compacts and does not enumerate or limit the Legislature's powers. We have described those powers as follows:

The Arizona Legislature is vested with the legislative power of the state, and has plenary power to deal with any subject within the scope of civil government unless it is restrained by the provisions of the Constitution.

*Giss v. Jordan*, 82 Ariz. 152, 159, 309 P.2d 779, 783 (1957). The law-making power reposed in the Legislature is extremely broad and has been described in this manner:

[T]he legislature has the authority and it is its duty, on occasion, to deal with every element of human experience involved in the life of the community, and in the exercise of this authority, and in the discharge of this duty, the sweep of its vision is as wide as the confines of human knowledge. Thus, subject to constitutional limitations, a state legislature may enact any statute it deems necessary for the public interest, and in the exercise of that authority may frame its enactments and express its intention and purpose as it sees proper.

*Turner*, 3 Ariz.App. at 417, 415 P.2d at 130 (quoting 82 C.J.S. *Statutes* § 9, at 23–24 (1953)).

By enacting § 5–601 in 1992, the Legislature originally gave the governor broad power to negotiate and reach agreement with Arizona's Indian tribes. It is certainly arguable that the governor would not have had the power to do so absent legislative authority,[4] but this is not a question we need resolve here. The negotiation power given the governor in § 5–601 was modified but not eliminated by the adoption through initiative of § 5–601.01, which states "[n]otwithstanding any other law or the provisions of section 5–601, the state, through the governor, shall...."

The almost unlimited power the Legislature gave the governor in § 5–601 was thus taken from the governor by the people when they adopted § 5–601.01. In this we see no violation of the constitutional separation of powers. *See Shute v. Frohmiller*, 53 Ariz. 483, 495, 90 P.2d 998, 1003 (1939). The Legislature had the power to determine the terms and limits of a compact with the tribes and originally, through § 5–601, delegated to the governor the power to negotiate and decide on almost all but not every one of

---

4. *See Tillotson v. Frohmiller*, 34 Ariz. 394, 271 P. 867 (1928) (under Ariz. Const. art. III, Legislature must set state policy and cannot delegate power to executive or other agency); *see also* *State ex rel. Stephan v. Finney*, 251 Kan. 559, 836 P.2d 1169 (1992) (compact with tribe is legislative act); *State ex rel. Clark v. Johnson*, 120 N.M. 562, 904 P.2d 11 (1995).

those terms. Through the initiative process, the people exercised their power to remove the governor's unfettered discretion to decide on the terms of the compact and instructed him to give those tribes without compacts the same terms he had given the other tribes. In carrying out this mandate, the governor acts as the state's agent. This not only does not violate the Arizona Constitution, it is at the very core of state constitutional doctrine, as this court has previously noted:

> The Legislature, in the exercise of that lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect. Once the Legislature has acted, however, it becomes the duty of the Executive to "take care that the laws be faithfully executed."

*Rios*, 172 Ariz. at 12, 833 P.2d at 29. This principle applies even more strongly when the people have legislated, for both the legislators and the governor are elected to serve the will of the people.

### D. Section 5–601.01 is not a special law in violation of the Arizona Constitution

■ The Governor contends § 5–601.01 violates article IV, part 2, § 19 of the Arizona Constitution, which forbids the enactment of "local or special laws ... [w]hen a general law can be made applicable." We have applied a three-factor analysis to determine whether a statute passes muster under that provision. *State Compensation Fund v. Symington*, 174 Ariz. 188, 193, 848 P.2d 273, 278 (1993).

First, the statute establishing a classification must have a rational basis. This one does. There are twenty-one federally recognized Indian tribes in Arizona. Sixteen had entered into compacts with the state, acting through the Governor, before the Governor refused on the basis of *Rumsey* to enter into more. The statute makes the remaining five tribes—Salt River Pima–Maricopa Indian Community, Navajo Nation, Hopi Tribe, San Juan Southern Paiute Tribe, and Havasupai Tribe—all eligible for a § 5–601.01 compact. The classification is not only rational, it is all-inclusive—every tribe without a compact is eligible. A.R.S. § 5–601.01(B)(2).

Second, the classification must be legitimate. We see no illegitimacy to putting all that have compacts in one class and all that have not in the eligible class.

Third, the classification must be flexible, allowing members to move in or out as circumstances change. This classification is certainly elastic—any tribe that has no compact but negotiates one under the statute will no longer be a tribe that has not entered into a gaming compact and will no longer be eligible under subsection (B)(2). Any Arizona tribe newly recognized by Congress would be a tribe that has not entered into a compact and would become eligible under the subsection (B)(2) definition.

The statute meets each prong of the test and is thus not a local or special law.

### E. There is a standard compact

■ Section 5–601.01 defines the "standard form of gaming compact" as the compact containing provisions "common to the compacts entered into by this state with Indian tribes in this state on June 24, 1993." We have read each of the five compacts made before June 24, 1993. None contains the location restriction the Governor wishes to impose on the Tribe, although all contain a clause regarding location. All (as well as the entire text of the five compacts) are essentially identical, reading as follows:

> Authorized Gaming Facility Locations. The [Tribe] is authorized to operate [X] Gaming Facility locations based on current tribal enrollment figures. All Gaming Facility locations shall be located not less than one and one-half miles apart and shall be located on the Indian Lands of the [Tribe]. The [Tribe] shall notify the State Gaming Agency of the physical location of any Gaming Facility a minimum of thirty (30) days prior to commencing gaming authorized pursuant to this Compact at such location. Gaming on lands acquired after the enactment of the Act on October 17, 1988 shall be authorized only in accordance with 25 U.S.C. § 2719.

The Tribe's proposed compact contained the quoted clause, as well as text substantially identical to that found in the first five com-

pacts. Thus, we conclude there is a standard form of compact, as those words are used in § 5–601.01(B)(1). The location clause in the compact the Tribe tendered to the Governor is in the standard form referred to in Proposition 201; the one the Governor signed and sent to the Tribe is not because it contains the clause giving the state's gaming agency the right of approval over the casino site. That right is not given the gaming agency in the five standard compacts.

## CONCLUSION

■ The fundamental issue in this case is not the question of whether the state should or should not negotiate gaming compacts with Indian tribes or whether the state should or should not have veto power over a tribe's selection of location. The issue, rather, is whether this court has the obligation to implement and enforce a law adopted by the people by initiative that in clear, unambiguous text requires the governor to agree to identified terms and enter into compacts with Indian tribes. We answer that question affirmatively.

■ Proposition 201, codified as A.R.S. § 5–601.01, does not repeal its predecessor, § 5–601, and does not deprive a governor of the ability to negotiate. Read together, the statutes simply and unambiguously permit negotiations and set the minimum terms to which a governor must agree if negotiations prove unsuccessful. In so doing, the statute does not violate the requirements of IGRA or the separation of powers doctrine because the state's initiative process gives the people the ultimate authority to decide on the terms of the state's gaming compacts with the Indian tribes. Nor does the Indian Gaming Regulatory Act give a governor the unfettered discretion to act on behalf of the state. The act only requires that the *state* negotiate in good faith. Using their initiative power, the people have the authority to act for the state and dictate to the Legislature and the governor a good faith bargaining position, including the minimum terms of any compact.

We therefore conclude that a governor, if unsuccessful in any negotiations and if requested by a tribe, must sign the standard form of compact defined in § 5–601.01. In reaching that conclusion we do not discourage Governor Hull from re-opening negotiations. Nothing in IGRA or the initiative measure requires the parties to remain at impasse.

ZLAKET, C.J., and MOELLER and MARTONE, JJ., concur.

JONES, Vice Chief Justice, specially concurring:

I concur in the result reached by the court on the issues raised in the Petition and Response but write separately to express a cautionary note with respect to what I perceive as a substantial federal-state conflict between the federal statute, IGRA, which mandates tribal-state negotiation in defined circumstances, and the Arizona "Fairness" initiative, Ariz.Rev.Stat. Ann. § 5–601.01, which authorizes tribes in Arizona to obtain, on demand, "standard-form" gaming compacts with the state.

The issues raised by the parties are narrow and do not acknowledge or implicate any federal restriction on the authority of a tribe to engage in class III gaming in this state. Indeed, the position urged by the tribe assumes unrestricted tribal authority, subject only to obtaining a signed compact. In its simplest terms, the question put to the court is whether section 5–601.01, a state law, effectively satisfies IGRA's mandate that the state "negotiate with the Indian Tribe in good faith" for a compact governing class III gaming on the reservation. *See* 25 U.S.C.A. § 2710(d)(3)(A). As a matter of state law, I believe that it does and that the Salt River Pima–Maricopa Indian Community is entitled to the standard-form compact as demanded.

But this conclusion does not answer the more dispositive federal question, neither raised nor argued before us—whether, in Arizona, a tribe is authorized under IGRA to engage in class III gaming. Clearly, the state has no power to grant such authority. Only the Congress can so authorize, and, in my view, the statute's express language provides strong indication that the Congress has declined to do so:

Class III gaming activities shall be lawful on Indian lands **only if** such activities are—

(B) located in a State that permits such gaming for any purpose, by any person, organization, or entity. . . .

IGRA, 25 U.S.C.A. § 2710(d)(1)(B) (emphasis added).

IGRA thus places an absolute prohibition on tribal authority to engage in class III gaming unless such gaming is otherwise permitted on non-tribal land within the state in which the tribal gaming is proposed.

The United States Court of Appeals for the Ninth Circuit in *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250 (1995) *cert. denied,* —— U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997) addressed two federal issues: (a) whether IGRA confers authority on a tribe to engage in class III gaming in California, a state which generally prohibits such gaming, and (b) whether, notwithstanding California's class III prohibition, the state has a duty under IGRA to negotiate over such gaming with the tribe. The Ninth Circuit, interpreting and applying IGRA, responds negatively to both questions:

The state contends that IGRA does not obligate it to negotiate with the Tribes over the Proposed Gaming Activities. IGRA provides that "Class III gaming activities shall be lawful on Indian lands **only if** such activities are . . . located in a State that **permits such gaming** for any purpose by any person, organization, or entity. . . . " 25 U.S.C. § 2710(d)(1)(B). Consequently, where a state does not "permit" gaming activities sought by a tribe, **the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them.**

*Id.* at 1256 (emphasis added).

Arizona, like California, maintains a general statutory prohibition against class III gaming. A.R.S. §§ 13–3301, *et seq.* The initiative statute, section 5–601.01, neither abolishes nor modifies Arizona's prohibition, nor has the tribe in the instant case made any such argument. Arizona's anti-gaming statutes clearly forbid, even criminalize, class III gaming activity and are validly enforced on non-tribal land throughout the state.

I concur in today's decision to uphold the tribe's right to a compact because the decision deals properly with the only issue presented—the effect of section 5–601.01 on the state's obligation to negotiate. The people have spoken, and the tribe, by initiating its demand on the Governor, has done what is legally required to obtain the "standard-form." While this conclusion brings the instant suit to an end, it does not reach the over-arching federal question raised in *Rumsey.* And, though federal preemption was argued on behalf of the Governor, it did not touch upon the matter of tribal authority. Preemption was argued only in the sense that section 5–601.01 somehow robbed the state of its authority to negotiate under IGRA. That argument was flawed, however, because section 5–601.01 became the voice of the state, thereby satisfying the requisite element of negotiation in the compacting process.

Under *Rumsey,* the question must ultimately be posed whether the State of Arizona, which prohibits class III gaming generally, has a federally imposed duty to negotiate, and, more importantly, whether any tribe in Arizona, in the face of *Rumsey*'s interpretation of IGRA's congressional mandate, has the right to engage in such gaming. *Rumsey* held that the state had no duty and that the tribe was without authority. Because the parties before this court have neither raised nor argued the *Rumsey* issue, the court, correctly, does not address it. One must nevertheless wonder, in the post-*Rumsey* era, whether under the current application of federal law the Salt River Pima–Maricopa compact anticipated as the result of this decision, as well as the sixteen existing tribal compacts governing class III gaming in Arizona, can remain viable.